# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-KA-00484-SCT

*ERIC BRANDON DRAKE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/02/2000 |
| TRIAL JUDGE: | HON. GEORGE B. READY |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JACK R. JONES, III |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | ANN LAMAR |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/04/2001 |
| MOTION FOR REHEARING FILED: | 10/15/2001; denied 12/6/2001 |
| MANDATE ISSUED: | 12/14/2001 |

### BEFORE McRAE, P.J., SMITH AND MILLS, JJ.

### MILLS, JUSTICE, FOR THE COURT:

¶1. Eric Brandon Drake was convicted of capital murder and conspiracy in the Circuit Court of DeSoto County for the murder of Jacky Harwell. He was sentenced to life imprisonment for capital murder and five years for the conspiracy conviction to be served concurrently with the life sentence. He timely perfected this appeal.

## FACTS

¶2. Officer Omar Elkouz of the DeSoto County Sheriff's Department was on routine patrol in the early morning hours of February 6, 1999, when he found a man's body lying in the road. The body was lying face down on the pavement. The man's pants were around his ankles, and he was wearing no socks or shoes. The body was later identified as that of Jacky Harwell. He had died from a contact gunshot wound to the left side of the head. A shell casing was found at the scene approximately five feet from the body.

¶3. No identification was found on the body; however, a letter found at the scene was addressed to Jacky Harwell. Andrew Perpener, Harwell's cousin, reported Harwell missing on February 8th. He later identified the body as Harwell's.

¶4. The investigation led to the home of nineteen-year-old Eric Brandon Drake, who had telephoned Harwell's pager the night of the shooting. Drake originally told the investigators a bogus story that he and Harwell had been victims of an attempted robbery. He agreed to accompany the officers to the scene of the alleged robbery. He voluntarily entered the police van and rode unrestrained in the front passenger seat. While directing the officers to the location of the alleged robbery, Drake admitted that he knew where

Harwell's automobile was located. The officers asked if he could take them to the location. He answered affirmatively and took the officers to the car which was located near his house. Officer Alan Thompson advised Drake of his *Miranda* rights at this point. Drake signed a form acknowledging that he understood his rights and was willing to talk freely and voluntarily to the police officers. He waived his right to an attorney for this interview. At this point Drake confessed to the officers that he and the two robbers, Manrese Long and Zachary Harrington, conspired to lure Harwell to the lake and rob him. Manrese Long lived with Drake. Harrington brought the gun to the scene. The gun belonged to Harrington's stepfather. Drake confessed to the officers that he took the gun from Harrington and shot Harwell.

¶5. According to Drake, he had met Harwell within the previous month. A few days prior to the shooting, Harwell had given Drake $20 to look at his penis. Drake called Harwell's pager on the evening of February 5; Harwell telephoned him; and the two agreed to meet at a church parking lot near Drake's residence. They met at the church. Drake got into Harwell's car, and Harwell drove to a nearby lake. Harwell parked the car and began making advances toward Drake. Harwell's pants were down when Harrington and Long walked up to the car and demanded money. Harrington and Long got into the car, and the three took Harwell at gunpoint to an isolated area. Drake took the gun from Harrington and shot Harwell in the head. The men took over $300 from Harwell. After the shooting, they divided the money.

¶6. After Drake's confession, the officers took Drake to his house to speak with his mother, Martha Drake. Officer Thompson testified as follows:

When we got inside, I told his mother, Mrs. Martha, I said, "Mrs. Drake, he's been involved in this homicide." And she looked at the father and they looked at Brandon, and she shouted to him and said, "Tell me you're not involved. Tell me you didn't have anything to do with it." Or "Tell me you didn't shoot him," I think that's the exact words she said. And he said - she was just shaking and trembling, and he said, "Mama, I shot him."

¶7. Drake was taken to the station house in Memphis, Mississippi, where Officer Thompson again read him his *Miranda* rights. Drake then gave a statement to Thompson which conflicted with his previous story. In the recorded and transcribed interview, Drake alleged that the shooting was an accident. Drake contended that he was a victim, not a participant in the robbery. He stated that the gun discharged as he tried to grab it from Harrington. He offered the same testimony at trial.

¶8. The jury found Drake guilty of conspiracy to commit robbery with a deadly weapon and capital murder. The State did not pursue the death penalty. The judge sentenced Drake to five years for conspiracy to run concurrently with life imprisonment for capital murder.

## DISCUSSION

### I. WHETHER THE TRIAL COURT ERRED IN REFUSING TO SUPPRESS DRAKE'S STATEMENT TO THE LAW OFFICERS.

¶9. Drake contends that his incriminating statements to law enforcement officers should have been suppressed for lack of timely advice required by *Miranda v. Arizona*, 384 U.S. 436, 477-78, 86 S.Ct. 1602, 1629-30, 16 L.Ed.2d 694, 725-26 (1966). The State argues that Drake did not make any inculpatory or incriminating statements during custodial interrogation until after he had been given his *Miranda* warnings at the location of Harwell's car. According to the State, every response until that point

had been gratuitous, voluntary, and exculpatory regarding the telephone call and Drake's involvement as a victim as opposed to a perpetrator.

¶10. When the trial court overrules a motion to suppress a defendant's confession, this Court will reverse that ruling only if it is manifest error or contrary to the overwhelming weight of the evidence. *O'Halloran v. State*, 731 So. 2d 565, 570 (Miss. 1999). "The voluntariness of a waiver, or of a confession, is a factual inquiry that must be determined by the trial judge from the totality of the circumstances." *Id.*

¶11. In overruling Drake's motion to suppress, the trial judge stated the following:

> I haven't heard anything to make me believe or feel like under the case law that the statement should be suppressed. I'm going to deny the motion. I think it's clearly an investigation, a preliminary investigation. The officers had the right to ask questions. He wasn't under arrest. He was taken-he voluntarily got in the van.
>
> * * *
>
> I don't see anything that indicates that the police officers are lying. All [Drake] did was give directions after that, but even at that point, I think they're entitled to see if he could actually take them to the car. They might have just been seeing if he could take them to the car. They had no confirmation that he could take them to the car until they got to the car. They confirmed it was the victim's car, and then at that point, they gave him the *Miranda* [warnings].

¶12. "The threshold question in a *Miranda* rights analysis is whether the defendant was in custody and being interrogated when the statement in question was made. Neither general on the scene questioning, nor voluntary statements made by a defendant are enough to trigger the requirements of *Miranda*." *Miller v. State*, 740 So. 2d 858, 867 (Miss. 1999) (citations omitted). In *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996), this Court stated:

> The test for whether a person is in custody is whether a reasonable person would feel that she was in custody. That is, whether a reasonable person would feel that she was going to jail-and not just being temporarily detained.... Whether a reasonable person would feel that she was "in custody" depends on the totality of the circumstances. Factors to consider include: (a) the place of interrogation; (b) the time of interrogation; (c) the people present; (d) the amount of force or physical restraint used by the officers; (e) the length and form of the questions; (f) whether the defendant comes to the authorities voluntarily; and (g) what the defendant is told about the situation.

(citations omitted).

¶13. The record reflects under the totality of the circumstances that Drake's conversations with the officers occurred prior to his being in custody. The places of interrogation were Drake's home and the police van, where Drake was an unrestrained, voluntary passenger. Both are non-custodial environments. The time of interrogation was mid-morning.

¶14. The officers arrived at Drake's residence in Memphis, Mississippi, at 10:30 a.m. Drake's *Miranda* rights were read to him approximately an hour later. During this one-hour period, Drake agreed to show the officers where the robbery took place and where the victim's car was located. Only three to five minutes elapsed between the time Drake voluntarily entered the police van and the victim's car was found. The

persons present during the interrogation were Drake's mother, father, and sister and Officers Doss and Thompson.

¶15. Later, in the van, only the officers were present with Drake. Neither officer was in uniform. No force or physical restraint was used during this period. Drake occupied the front passenger seat of the police van, a Ford Aerostar. The doors were unlocked. The questions were short and propounded for the purpose of clarifying Drake's role as a robbery victim. Drake's assistance to the officers was voluntary according to the trial court's findings. Further, Drake was told nothing that would make him believe he was in police custody during this investigatory interrogation. Thompson told Drake that a call to Harwell's pager had originated at the Drake residence.

¶16. After Drake told the officers that he and Harwell were victims of the robbery, Thompson asked Drake if he could take the officers to the scene. En route, Officer Doss asked Drake why he had not reported the robbery to law enforcement. Drake gave another story which did not exactly coincide with his first version. Thompson confronted Drake with the conflicts and asked if he knew where the car was located and if he could take them to the location. Drake nodded affirmatively to both questions. After confirming the maroon Lexus was registered to Harwell, the officers gave Drake his *Miranda* warnings.

¶17. Drake argues that he was a suspect from the beginning and should not have been interrogated without *Miranda* warnings. Officer Doss, however, testified that he was not prepared to base an arrest merely upon Drake's statements concerning the telephone call to Harwell's pager and some conflicting statements concerning Drake's role as a victim in the robbery. The officers were attempting to resolve an ambiguous situation. The mere possibility of incrimination does not mean that a custodial interrogation occurred in violation of *Miranda*. *Greenlee v. State*, 725 So. 2d 816, 825 (Miss. 1998).

¶18. The record does not reflect that the officers' questions were asked for the purpose of eliciting an incriminating statement from Drake. *Miranda* warnings were not a prerequisite to the admissibility of Drake's statements. We find no merit to this assignment of error.

## II. WHETHER DRAKE WAS DENIED HIS RIGHT TO A SPEEDY TRIAL.

¶19. Drake contends that the trial court erred in failing to dismiss this case for speedy-trial and 270-day-rule violations. Drake was arrested on February 13, 1999, and indicted on March 23, 1999. His attorney signed a waiver of arraignment and entered a not-guilty plea on behalf of his client on April 6, 1999. The trial began approximately 328 days later on February 28, 2000.

¶20. Miss. Code Ann. § 99-17-1 (2000) states as follows:

> Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.

¶21. An order of continuance was entered in this case on September 14, 1999, setting trial for February 28, 2000. The order was entered "upon the motion of the *parties* for a continuance" and was agreed to and signed by both Susan Brewer, Assistant District Attorney, and Jack Jones, III, Drake's attorney.

¶22. Trial began approximately 167 days after the order of continuance was entered. Deducting 167 days from 328 days results in 161 days. Thus, after deduction of the time which lapsed due to the agreed

continuance, Drake was tried well within the 270-day time frame. *See Herring v. State*, 691 So. 2d 948, 953-55 (Miss. 1997). We find no merit to this assignment of error.

### III. WHETHER THE TRIAL COURT ERRED IN REFUSING TO ALLOW DRAKE TO EXERCISE TWO OF HIS PEREMPTORY CHALLENGES OF WHITE MALE JURORS.

¶23. Drake exercised eleven peremptory challenges during the jury selection process. The targets of all but one of these were white male veniremen. The State voiced a *Batson* objection, and the trial court restored to the jury two of the veniremen, #27 and #40, after declining to accept Drake's race/gender-neutral reason for striking them. Drake's reason for his strikes against #27 and #40 was that the veniremen "looked hard."

¶24. Drake contends that the trial court erred in requiring him to offer race/gender-neutral reasons for his strikes because the State failed to make a prima facie showing of purposeful discrimination and failed to show a pattern of strikes based upon race or gender. Though the record does not reflect the precise racial and gender makeup of the jury, it is clear that three black jurors served.

¶25. A party's peremptory challenge must pass constitutional muster. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the United States Supreme Court extended *Batson* protection to include strikes exercised by criminal defendants, and in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 141, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), the Court applied *Batson* to strikes based on gender.

¶26. "The decisive question is whether the opponent of the strike has met the burden of showing that the proponent has engaged in a pattern of strikes based on race or gender, or in other words 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Henley v. State*, 729 So. 2d 232, 239 (Miss. 1998) (quoting *Batson*, 476 U.S. at 94). Thus, in the case sub judice, only after the State presents a prima facie showing of a *Batson* violation does the burden shift to the defendant to present a race-neutral explanation for challenging the jurors. *Mack v. State*, 650 So. 2d 1289, 1297 (Miss. 1994).

¶27. Ten of the eleven peremptory strikes used by Drake were exercised against white male veniremen. Certainly this fact exhibits a pattern against white males. Such a circumstance creates an inference of purposeful discrimination. In *Batson*, the Supreme Court stated:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.

*Batson*, 476 U.S. at 96-97, 106 S.Ct. at 1723. In the case sub judice the facts and all relevant circumstances are sufficient to raise an inference of purposeful discrimination. As the trial court noted, Drake's attorney "struck an entire class. . . ." The State made its prima facie case.

¶28. Further, the race/gender-neutral reason offered by Drake in rebuttal to the State's challenge is insufficient. Drake asserts that the two veniremen "[l]ooked kind of hard." Drake does not explain his

meaning, leaving the reason to appear pretextual. We find no merit to this assignment of error.

## IV. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING INTO EVIDENCE THREE PHOTOGRAPHS OF THE BODY OF THE DECEASED.

¶29. Drake argues that the trial court erred in allowing into evidence three photographs depicting Harwell's body. Exhibit 1 depicts Harwell's lifeless body lying in a small pool of blood at the edge of the highway in the position in which it was found at the scene of the crime. Exhibit 5 is a pre-autopsy photograph depicting the contact wound in front of the victim's left ear canal. Exhibit 6 is a pre-autopsy photograph depicting several superficial abrasions on the victim's nose and forehead. Drake asserts that the photographs have no probative value since the fact that Harwell was deceased and had been killed by a gunshot was undisputed.

¶30. "The admissibility of photographs generally lies within the sound discretion of the trial court; and, absent an abuse of discretion, the court's decision will be upheld on appeal." *Jackson v. State*, 784 So. 2d 180, 183 (Miss. 2001). "A review of our case law indicates that the discretion of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Williams v. State*, 544 So. 2d 782, 785 (Miss. 1987).

¶31. The only case in which this Court has reversed based on the admission of gruesome photographs is *McNeal v. State*, 551 So. 2d 151 (Miss. 1989). The photographs at issue in *McNeal* depicted a "full-color, close-up view of the [victim's] decomposed, maggot-infested skull." *Id.* at 159. This Court found the admission of these photographs violative of M.R.E. 403. The photographs in the case sub judice do not rise to this level of gruesomeness. *Id.*

¶32. Further, the photographs had probative value. The photographs revealed the position and location of Harwell's body on the edge of the highway, the peculiar arrangement of his clothing, the location of the contact bullet wound, and the nature of the trauma to his face and forehead. In light of the broad standard of admissibility permitted under this issue, we find that the trial court did not err in allowing the photographs into evidence. There is no merit to this assignment of error.

## V. WHETHER THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND WAS SUPPORTED BY SUFFICIENT EVIDENCE.

¶33. Drake attacks the verdict by questioning both the sufficiency and weight of the evidence which resulted in his convictions of capital murder and conspiracy. He complains that there were no eyewitnesses to the crime and that the statements relied upon by the State were taken under suspicious circumstances. He argues that the trial court erred in denying his motions for a directed verdict, peremptory instructions, JNOV or, in the alternative, a new trial.

¶34. This Court has stated the standard of review for sufficiency of the evidence as follows:

> Our concern here is whether the evidence in the record is sufficient to sustain a finding adverse to [the defendant] on each element of the offense of murder. In the present context we must, with respect to each element of the offense, consider all of the evidence-not just the evidence which supports the case for the prosecution-in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where,

with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Collier v. State*, 711 So. 2d 458, 461 (Miss. 1998) (quoting *Wetz v. State*, 503 So. 2d 803, 808 (Miss. 1987)) (citations omitted). If the evidence is found to be legally insufficient, then the defendant must be discharged. *May v. State*, 460 So. 2d 778, 781 (Miss. 1985).

¶35. The standard of review for determining whether a jury verdict is against the overwhelming weight of the evidence is as follows:

In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial. Only in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal.

*Collier*, 711 So. 2d at 461 (quoting *Pleasant v. State*, 701 So. 2d 799, 802 (Miss. 1997)) (citations omitted). If the verdict is against the overwhelming weight of the evidence, then a new trial is proper. *Collier*, 711 So. 2d at 461.

¶36. Throughout the course of the investigation, Drake offered a number of different versions of his story. He initially denied any knowledge of Harwell. Then he admitted being at the scene of the crime, but only as a victim, not as a perpetrator. Drake subsequently admitted to Officers Thompson and Doss that he knew where Harwell's car was located. After directing the officers to the car and after being advised of his *Miranda* rights, Drake confessed that he, Long, and Harrington had conspired to lure Harwell to the lake and rob him. He admitted that he shot Harwell and, at this time, did not claim that the shooting was an accident. Drake again confessed in the presence of his mother that he shot Harwell. During later custodial interrogation, Drake changed his story and again characterized himself as a victim of the robbery. He stated that the pistol discharged when he grabbed it in an effort to prevent the murder. At trial Drake continued to characterize himself as a victim of the robbery. He testified that Harrington pointed the pistol at Harwell's head. Drake reached for the gun and "when [he] made contact with [Harrington's] hand, it went off." He then noticed that he had gotten control of the gun and that Harwell was lying on the ground. Drake testified that he accepted a portion of Harwell's money from Harrington because he was afraid of Harrington.

¶37. Despite the changing nature of Drake's story, the fact remains that Drake confessed to Officers Thompson and Doss that he conspired with Harrington and Long and that he shot Harwell. The jury was left to examine the changing stories and to weigh the evidence and the credibility of all the witnesses, including the officers and Drake. "It goes without saying that the jury is the final arbiter of a witness's credibility." *Morgan v. State*, 681 So. 2d 82, 93 (Miss. 1996). It was the jury's function to determine whether Drake told the truth at trial or in his inculpatory statements made to Officers Thompson and Doss. Drake's confessions and the corroborative evidence are sufficient to support Drake's convictions of capital murder and conspiracy. "It is not for this Court to pass upon the credibility of witnesses, and where the evidence justifies the verdict it must be accepted as having been found worthy of belief." *Grooms v. State*, 357 So. 2d 292, 295 (Miss. 1978) (quoting *Murphree v. State*, 228 So. 2d 599 (Miss. 1969)). This Court "will not set aside a guilty verdict, absent other error, unless it is clearly a result of prejudice, bias or fraud, or is manifestly against the weight of credible evidence." *Maiben v. State*, 405 So. 2d 87, 88 (Miss. 1981). The verdict in the case sub judice cannot be characterized as such. We find no merit to this

assignment of error.

## VI. WHETHER THE TRIAL COURT ERRED IN DENYING JURY INSTRUCTIONS REGARDING LESSER-INCLUDED OFFENSE THEORIES.

¶38. Drake contends that the trial court erred in refusing his proposed instructions regarding lesser-included offense theories. Drake fails to enumerate the specific instructions at issue; however, an examination of the record reveals that he proposed instructions for murder, depraved heart murder, and manslaughter. All were refused.

¶39. The State did not pursue the death penalty in this case; therefore, the trial court sentenced Drake to life imprisonment. Both murder and depraved heart murder carry sentences of life imprisonment. Miss. Code Ann. § 97-3-21 (2000). Thus, even if Drake was entitled to instructions outlining these two theories, the denial of those instructions was harmless error. *See Fairchild v. State*, 459 So. 2d 793, 801 (Miss. 1984).

¶40. A lesser-included offense instruction should be given if there is an evidentiary basis in the record that would permit a rational jury to find the defendant guilty of the lesser-included offense and to acquit him of the greater offense. *Underwood v. State*, 708 So. 2d 18, 36 (Miss. 1998). The lesser-included offense instruction should be granted unless the trial court and ultimately this Court can say, viewing the evidence in the light most favorable to the defendant and considering all the reasonable inferences which may be drawn in favor of the defendant from the evidence, that no reasonable jury could find the defendant guilty of a lesser-included offense. *Id.*

¶41. Following these guidelines, the trial court found no evidentiary basis for the lesser-included offense instructions. "Mississippi case law will not permit an instruction without credible evidence supporting its premise." *Holland v. State*, 705 So. 2d 307, 353 (Miss. 1997). While all doubts in a capital murder case should be resolved in favor of the defendant, "a lesser-included offense instruction should never be granted on the basis of pure speculation." *Fairchild*, 459 So. 2d at 801.

¶42. This Court has often stated that a defendant is entitled to have the theory of his defense presented to the jury. *Triplett v. State*, 672 So. 2d 1184, 1186 (Miss. 1996). Drake argues that the refusal of the lesser-included offense instructions prevents him from doing so. This is not the case. Drake's theory of the case is that he did not participate in the robbery but, to the contrary, was a victim. He claims that he was attempting to prevent a shooting when the "accidental" shooting occurred. If the jury had chosen to believe Drake's description of the course of events, Drake would have been acquitted. He would not have been guilty of manslaughter or murder. Thus, Drake's theory is not one of manslaughter or murder but rather one of excusable homicide. *See* Miss. Code Ann. § 97-3-17 (2000).

¶43. A pertinent portion of Drake's proposed manslaughter instruction states as follows:

> If you find from the evidence in this case, beyond a reasonable doubt, that Eric Brandon Drake, on or about February 5, 1999, in DeSoto Co., Miss. was negligent and the negligence was so gross as to be tantamount to a wanton disregard of, or utter indifference to the safety of human life, and such negligence, if any, directly caused the death of Jacky Harwell, then you shall find the Defendant, Eric Brandon Drake, guilty of manslaughter.

This instruction does not reflect Drake's theory of the case. More importantly, there is no evidentiary basis

for the instruction. Therefore, it was properly refused.

¶44. Neither the evidence nor Drake's own theory of the case support a manslaughter instruction or a murder instruction. The trial court did not commit reversible error in refusing the instructions. We find no merit to this assignment of error.

### VII. WHETHER THE TRIAL COURT ERRED IN GRANTING A JURY INSTRUCTION DEFINING CONSPIRACY.

¶45. Drake asserts that the trial court committed reversible error in granting jury instruction S-1 which defined the crime of conspiracy charged in Count 1 of Drake's indictment. Drake argues that the instruction is not supported by credible evidence.

¶46. "The general rule is that all instructions must be supported by the evidence. Where an instruction is not supported by evidence then it should not be given." *Hicks v. State*, 580 So. 2d 1302, 1306 (Miss. 1991). The trial court found that the testimony of Officers Thompson and Doss supported the instruction and granted it. We agree with the trial court's decision.

¶47. The following testimony elicited from Thompson supports an instruction embodying the State's conspiracy theory:

Assistant District Attorney: So now that you're at the scene of the car here at Mistle Toe and Hickory Bark, he tells you the names of the two robbers?

Thompson: That is correct.

Q: Manrese Long and who?

A: Zachary Harrington.

Q: And immediately after he tells you the names of those two individuals, what does he tell you?

A: He stated that the three of them had talked about this earlier, and they were needing money, and that they had called Mr. Harwell to come to the lake area, or Brandon had called him to the lake area.

Q: Why?

A: Of course, he said he didn't know what the plan was, and this was made in another statement.

Q: Let's talk about what he said here, now. Read your report. Did you write down exactly what was said in your report?

A: I did.

Q: What does it say?

A: Drake stated the three of them conspired to lure Harwell to the lake and rob Harwell.

Q: The three of them being who?

A: Zachary Harrington, Manrese Long, and Eric Brandon Drake.

\* \* \*

Q: While you're at the scene of the car, what does he tell you about the three of them and their plan?

A: He told me that the plan was to have Mr. Harwell come to the lake and was going to rob him at the lake area.

Officer Doss's testimony corroborates Thompson's testimony.

¶48. "The essence of a criminal conspiracy is two or more persons combining and agreeing to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully." *Clayton v. State*, 582 So. 2d 1019, 1022 (Miss. 1991). The testimony of Officers Thompson and Doss clearly establish an evidentiary basis for an instruction embodying the State's conspiracy theory. Therefore, the instruction was properly granted. We find no merit to this assignment of error.

## CONCLUSION

¶49. This Court finds no merit in the foregoing assignments of error. We, therefore, affirm Eric Brandon Drake's convictions for conspiracy and capital murder and his life sentence and five-year concurrent sentence.

¶50. **COUNT I: CONVICTION OF CONSPIRACY TO COMMIT ROBBERY WITH A DEADLY WEAPON AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THE SENTENCE IN COUNT I SHALL RUN CONCURRENTLY WITH THE SENTENCE IN COUNT II.**

**PITTMAN, C.J., BANKS AND McRAE, P.JJ., SMITH, WALLER, COBB, DIAZ AND EASLEY, JJ., CONCUR.**