# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-01122-COA

PITIPONG DAENGBUNGA                                            APPELLANT

v.

STATE OF MISSISSIPPI                                            APPELLEE

DATE OF JUDGMENT:           08/21/2024
TRIAL JUDGE:                HON. RANDI PERESICH MUELLER
COURT FROM WHICH APPEALED:  HARRISON COUNTY CIRCUIT COURT,
                            SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:     OFFICE OF STATE PUBLIC DEFENDER
                            BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:      OFFICE OF THE ATTORNEY GENERAL
                            BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:          WILLIAM CROSBY PARKER
NATURE OF THE CASE:         CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 01/27/2026
MOTION FOR REHEARING FILED:

## BEFORE CARLTON, P.J., LAWRENCE AND LASSITTER ST. PÉ, JJ.

## LASSITTER ST. PÉ, J., FOR THE COURT:

¶1.     On October 17, 2022, a Harrison County grand jury indicted Pitipong Daengbunga and charged him with the murder of Jamie Boggs and tampering with evidence. Following a jury trial, Daengbunga was found guilty of both counts and was sentenced to life imprisonment for murder and to serve ten years in custody for tampering with evidence. Daengbunga's post-trial motion was denied, and he now appeals, asserting two points of error.

¶2.     First, Daengbunga argues that the circuit court erred by denying his pre-trial motion

to suppress. Second, he claims the circuit court erred in allowing the State to admit evidence of his "prior bad acts." We find no reversible error and affirm the circuit court's judgment.

## FACTS AND PROCEDURAL HISTORY

### I. The Crime and Trial

¶3. On the morning of February 5, 2022, Daengbunga walked into the emergency room (ER) at the Veterans Affairs hospital (VA) in Biloxi. Upon arriving, Daengbunga proceeded to the customer service area and informed personnel that he wanted to speak with VA police. Officer Scott Smith responded to the ER, introduced himself to Daengbunga, and asked how he could be of assistance. In response to Smith's question, Daengbunga told him that his roommate—Jamie Boggs—had attacked him with a knife and that, in self-defense, he struck her with a hammer multiple times, eventually killing her. Daengbunga also told Smith that his fight with Boggs occurred around 1:30 a.m. at their shared apartment and that he had wrapped Boggs in blankets and burned the clothes he had been wearing before coming to the VA.

¶4. According to Smith, he noticed that Daengbunga had an injury to his right hand but did not appear to have any other injuries. After briefly speaking with Daengbunga in the ER, Smith requested that hospital staff move Daengbunga to a private exam room to treat the injuries to his right hand. Smith stated that once Daengbunga was in the exam room and being treated for his wounds, Smith contacted fellow VA officer Michael Hodek and requested that Hodek keep an eye on Daengbunga while Smith notified the Biloxi Police

2

Department about Daengbunga's confession. While Hodek reported to the exam room, Biloxi police went to the apartment and discovered Boggs's body.

¶5.     When Officer Hodek arrived at Daengbunga's exam room, he noticed that Daengbunga's hand was bloody, "really cut up," and that the bone was visible. Upon noticing the condition of Daengbunga's hand, Hodek asked him, "Brother, what'd you do to your hand?" Hodek testified that in response to this question, Daengbunga said that "his roommate [Boggs] had attacked him with a hammer and that to defend himself he had to slit [Boggs's] throat." Daengbunga then explained that he wrapped Boggs's body in blankets, took a shower, and then burned his clothes before leaving the apartment. Additionally, Daengbunga told Hodek that Boggs had hit him multiple times with a hammer. Hodek took pictures of the parts of Daengbunga's body that were allegedly struck, yet Hodek stated that he did not observe any injuries to Daengbunga aside from the injury to his hand. After Daengbunga's hand was treated by hospital staff, he was taken to the Biloxi Police Department and remained in custody until trial.

¶6.     At trial, Daengbunga's statements to Officers Smith and Hodek were admitted into evidence over his objection. Testimony was also provided by members of the Biloxi Police Department who responded to the apartment and crime scene investigators. Officer Candace Young testified that she "processed" the scene at the apartment and stated that Boggs's body was located behind the bedroom door, tightly wrapped in blankets. Young went on to say that when she first saw Boggs's body, she noted "the amount of blood . . . on the walls and in the

3

carpet." Young also noted that Boggs had "multiple stab wounds, slices, [and] cuts" and that chunks were missing from "[Boggs's] head, neck and face."

¶7.     Medical examiner Dr. Stacy Turner testified that Boggs's manner of death was homicide and that multiple causes of death were identified during Boggs's autopsy, including "blunt force injuries, sharp force injuries, and strangulation." Additionally, Dr. Turner stated that the muscles in both the left and right carotid arteries were torn in Boggs's neck. She also testified that Boggs had a facial injury underneath her left eye that was "consistent in appearance with a bite mark." Swabs of the bite mark were taken, and forensic biologist Jana Burchfield testified that DNA test results "produced a profile that [was] consistent with [Daengbunga]."

¶8.     The State also introduced evidence of a prior domestic violence conviction to disprove Daengbunga's claim that he killed Boggs only in self-defense. The State reasoned that there were multiple similarities between Daengbunga's previous attack—where he never pled self-defense—and his attack on Boggs. After all the evidence was presented, the jury convicted Daengbunga of first-degree murder and tampering with physical evidence. Subsequently, the circuit court sentenced him to life imprisonment for murder and to serve a consecutive term of ten years in the custody of the Mississippi Department of Corrections for tampering with physical evidence.

## II.     Pre-Trial Issues

### A.     Suppression of Daengbunga's Statements

¶9.     Prior to trial, Daengbunga filed a motion to suppress the statements he made to police officers while at the VA. In this motion, Daengbunga claimed the "questioning and statements" elicited by law enforcement at the VA were obtained in violation of his *Miranda* rights.[1] Essentially, Daengbunga argued that he was in custody while at the VA, and therefore Officers Smith and Hodek should have told him his *Miranda* rights before they asked him any questions. The State filed a motion in opposition, arguing that Daengbunga was not in custody for *Miranda* purposes while he was at the VA. The circuit court conducted a hearing, and testimony was provided by VA Officers Smith and Hodek, as well as members of the Biloxi Police Department who responded to the VA.

¶10.    Smith spoke about his encounter with Daengbunga and stated that after he introduced himself to Daengbunga, Daengbunga "just went straight to his story" about Boggs attacking him and defending himself with a hammer. Once Smith learned that Boggs had been struck multiple times with a hammer, "the only [follow up] question" Smith asked of Daengbunga was for the apartment's address. Officer Smith explained that after he learned Daengbunga's address, he contacted the Biloxi Police Department so those officers could perform a welfare check on Boggs.

¶11.    Smith went on to say that after getting Daengbunga moved to a treatment room, he contacted Hodek and asked him to stand by Daengbunga's room to "keep an eye on him." Smith testified that he asked this of Hodek because he needed to contact the Biloxi Police

_____

[1] *Miranda v. Arizona*, 384 U.S. 436, 477-78 (1966).

5

Department and report Boggs's injuries/possible death, because Daengbunga had not been checked for weapons, and because Smith was concerned about the safety of hospital staff. However, Smith testified that he made it clear to Hodek that Daengbunga was not under arrest. Smith went on to say that Daengbunga could have left at any time while in the exam room and that nothing could have prevented Daengbunga from leaving. Smith also stated that Daengbunga was never handcuffed, restrained, or told he could not leave.

¶12. Officer Hodek stated that after he had received Smith's call asking him to report to Daengbunga's exam room, he noticed that Daengbunga's right hand was injured and asked him, "Brother . . . what did you do to your hand?" Hodek testified that this was one of only two questions he asked Daengbunga. After Hodek asked this question, Daengbunga "said that his roommate had attacked him with a hammer, and that he had to defend himself and that to defend him[self] he had to slice her throat." Hodek went on to say that Daengbunga was "extremely calm" when describing Boggs's death and that the only time Daengbunga made eye contact with Hodek was when he looked up and said, "I had to cut her throat."

¶13. Although Hodek did not observe any injuries to Daengbunga aside from his injured hand, the second question he asked was if Daengbunga had any other injuries. Daengbunga indicated that Boggs had struck him in the head, torso, and legs with a hammer, so Hodek took pictures of those areas while hospital staff was treating Daengbunga's hand. Hodek stated that it took approximately fifteen minutes to get the pictures taken, and once he finished, he remained at the nurse's station about "15 feet away from the door" of

Daengbunga's exam room. When asked if Daengbunga was ever "in custody" during his interaction with VA police, Hodek replied, "[N]o." Similar to Officer Smith, Hodek stated that Daengbunga was never restrained, handcuffed, or told that he could not leave the hospital.

¶14. Next to testify were Biloxi police officers James Gladden and Nicholas Sonnier. Both Gladden and Sonnier testified that although they responded to the VA, when they arrived, Daengbunga was receiving medical treatment on his injured right hand; therefore, Biloxi police officers elected not to interview him at the hospital. Rather, law enforcement decided to wait until he received a medical release and was taken into police custody to formally read him his *Miranda* rights.

¶15. Following the presentment of testimony, the circuit court denied Daengbunga's motion to suppress, noting that "whether or not *Miranda* applies depends on whether or not the defendant was in custody when he made the statements and whether or not those statements were voluntary." The circuit court also reasoned that custody determinations are made using a reasonable person standard and depend on the totality of circumstances.

¶16. The circuit court found that Daengbunga voluntarily went to the VA hospital six hours after he killed Boggs, that he went to the VA to get treatment for a non-life-threatening injury to his hand, and that upon his arrival he requested to speak to police. Additionally, the circuit court reasoned that by 7:05 a.m., i.e., less than fifteen minutes after Daengbunga requested to speak with an officer, he had already voluntarily told both Smith and Hodek that he had

7

killed Boggs in self-defense.

¶17. The circuit court concluded by highlighting the fact Daengbunga voluntarily sought out VA police, and the court determined that "[it] just [couldn't] find under these set of facts that . . . any kind of *Miranda* violation [occurred]." After the court denied Daengbunga's motion to suppress, the case proceeded to trial on August 13, 2024.

### B. Exclusion of Prior Bad Acts

¶18. At the same hearing, the circuit court addressed a motion in limine the State filed to introduce Daengbunga's prior conviction of domestic violence in Jones County. In the motion, the State argued that under Mississippi Rule of Evidence 404(b), evidence of Daengbunga's previous conviction should be admitted because it showed his intent, modus operandi, and lack of self-defense. In contrast, the defense argued that the introduction of Daengbunga's previous conviction into evidence would violate Rule 403. The defense reasoned that the introduction of Daengbunga's previous conviction would be more prejudicial than probative because Daengbunga claimed he killed Boggs in self-defense yet never made such a claim during the previous case.

¶19. Testimony regarding Daengbunga's previous assault was provided by Thad Windham, a member of the Jones County Sheriff's Department. Windham stated that on the evening of December 18, 2015, he received a call from dispatch reporting a domestic disturbance at Daengbunga's residence in Laurel. Windham testified that when he arrived at the scene, another deputy had already placed Daengbunga in the back of a squad car, and "[i]t was

8

obvious that there had been some type of altercation" because there was blood on the walls, porch, and steps of the house. Windham stated that after he obtained some information from the responding officer, it came to light that Daengbunga had violently beaten Christine Crawford with a tree branch.

¶20. Law enforcement initially assumed that Daengbunga and Crawford were husband and wife, but Crawford later clarified they were not legally married despite living together and having two small children. The branch was recovered from the residence and had pieces of Crawford's "blood and skin on it." Windham went on to say that Crawford's eyeball was recovered in the front yard.

¶21. After he learned of the attack on Crawford, Windham removed Daengbunga from the patrol car and began taking pictures of him. According to Windham, Daengbunga was "bloody literally from head to toe," and although EMS had checked him for injuries, they found none on Daengbunga before leaving. Windham did not observe any injuries to Daengbunga either.

¶22. Upon leaving the scene, Windham went directly to South Central Regional Medical Center and made contact with Crawford. Windham described Crawford's injuries as extensive, saying that she was "bloody from head to toe," missing her left eye, that "[her] right cheek . . . had a chunk of meat missing from it," and that "part of the right side of her nose was missing." Windham also described a bite mark on Crawford's face.

¶23. Windham went on to say that Crawford's injuries were so severe that she was unable

to speak; yet when he asked if Daengbunga was the one who attacked her, she "nodded her head . . . yes." Windham concluded by noting that officers were unable to determine a motive from Daengbunga's attack on Crawford. As a result of his attack on Crawford, Daengbunga was charged with mayhem and attempted first-degree murder; however, he was only indicted for domestic aggravated assault and subsequently pled guilty at trial.

¶24.     Following Windham's testimony, the circuit court granted the State's motion to use the prior bad acts evidence, reasoning that "the photos and testimony . . . [were] relevant to the motive, intent and [Daengbunga's] claim of self-defense." The court also noted that the evidence was "more probative than prejudicial" under Rule 403, as "both these cases involve severe facial attacks on women [Daengbunga] was living with."[2]

¶25.     Daengbunga's statements and evidence of his prior conviction were admitted at trial. Subsequently, the jury found Daengbunga guilty of both counts, and the circuit court sentenced him to life in prison for first-degree murder and to serve ten years for tampering with physical evidence; the sentences were ordered to run consecutively. Daengbunga then filed a post-trial motion for a judgment notwithstanding the verdict, which the circuit court denied. Now, Daengbunga appeals.

**ANALYSIS**

¶26.     On appeal Daengbunga raises two points of error. First, he argues that the circuit court

---

[2] *See* MRE 403 (permitting exclusion of "relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . .").

erred by denying his motion to suppress statements he made to law enforcement officers while at the VA hospital. Daengbunga claims that he was in custody when officers questioned him, and therefore he should have been read his *Miranda* rights. Consequently, he argues that their failure to do so violated his constitutional rights and that the circuit court erred by denying his motion to suppress. Second, he claims that the circuit court erred by allowing the State to present evidence of his prior conviction for aggravated domestic violence. For the reasons explained below, we find neither of Daengbunga's arguments persuasive and affirm the circuit court's judgment.

## I.      Suppression of VA Statements

¶27.    Daengbunga argues that the inculpatory statements he made to VA Officers Smith and Hodek should have been suppressed because they were obtained in violation of his *Miranda* rights. Daengbunga claims that he was in custody while at the VA and that the officers were required to Mirandize him before obtaining his statements. Daengbunga argues that the failure to do so violated his Constitutional rights and that the circuit court erred by failing to grant his motion to suppress. However, Daengbunga is mistaken.

¶28.    "We will not reverse the trial court's ruling on a motion to suppress unless the ruling was manifestly wrong, based on an incorrect legal standard, or against the overwhelming weight of the evidence." *McCammon v. State*, 299 So. 3d 873, 889 (¶53) (Miss. Ct. App. 2020). This is because "[t]he trial judge sits as the fact-finder when determining the issue of whether an accused's statement has been intelligently, knowingly and voluntarily given." *Id.*

11

(quotation marks omitted). "The threshold question in a *Miranda* rights analysis is whether the defendant was in custody and being interrogated when the statement in question was made. Neither general on[-]the[-]scene questioning[] nor voluntary statements made by a defendant are enough to trigger the requirements of *Miranda*." *Drake v. State*, 800 So. 2d 508, 513 (¶12) (Miss. 2001). *Miranda* warnings "must be given before a suspect is subjected to custodial interrogation." *McCammon*, 299 So. 3d at 889 (¶53).

¶29. The phrase "custodial interrogation" "means the suspect is both in custody and undergoing interrogation." *Id.* "The test for whether a person is in custody is whether a reasonable person would feel that [he] was in custody. That is, whether a reasonable person would feel that [he] was going to jail—and not just being temporarily detained." *Hunt v. State*, 687 So. 2d 1154, 1160 (Miss. 1996). Stated differently, "[a]n individual is in custody if a reasonable person would find [his] ability to freely leave restricted." *Roberson v. State*, 61 So. 3d 204, 208 (¶12) (Miss. Ct. App. 2010).

¶30. Further, our Supreme Court has advised that "[w]hether a reasonable person would feel that [he] was 'in custody' depends on the totality of the circumstances." *Hunt*, 687 So. 2d at 1160. Some of the factors considered include the time and place of interrogation, the presence or absence of law enforcement, whether the suspect was restrained, the length of the interrogation, and whether the suspect voluntarily came to the authorities. *See generally id.*

¶31. Moreover, "interrogation under *Miranda* refers not only to express questioning, but

also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Batiste v. State*, 121 So. 3d 808, 858 (¶121) (Miss. 2013) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

¶32.    After our review of the record, we find no error by the circuit court and conclude that Daengbunga was not "in custody" or being interrogated for *Miranda* purposes while at the VA. There is no evidence to support a conclusion that an objective person would have believed he was in custody when Daengbunga made his first statement to Officer Smith. The statement was made at a hospital, not a police station, and only one officer was present. There is no evidence that Daengbunga was restrained or forced to speak with Officer Smith. Officer Smith's questions were generic and not likely to elicit an incriminating response. Officer Smith approached Daengbunga at his request, and when Officer Smith asked how he could help Daengbunga, Daengbunga volunteered the information that he had killed Boggs. As noted, voluntary statements do not trigger the requirements of *Miranda*. *See Drake*, 800 So. 2d at 513 (¶12).

¶33.    Similarly, Daengbunga's statement to Officer Hodek did not invoke the required *Miranda* warnings. Although Daengbunga had been moved to a secluded room, no officer or hospital staff told him he was required to stay there, he was not restrained, and there was only one officer in the room with him. No objective person would have believed he was in custody, and *Miranda* warnings were not required before Officer Hodek asked what

13

happened to Daengbunga's hand.

¶34. Thus, we hold that the circuit court did not err by finding that no *Miranda* violation occurred, and the denial of Daengbunga's motion to suppress was proper. Based on the objective totality of circumstances, Daengbunga was not in custody while at the VA, and therefore, he was not entitled to any *Miranda* warnings prior to or during his conversations with Smith or Hodek.

## II. Prior Bad Acts

¶35. As discussed *supra*, the State filed a motion in limine prior to trial seeking to introduce evidence of Daengbunga's previous conviction for aggravated domestic violence. Daengbunga filed a response in opposition, and after the circuit court conducted a hearing, the court granted the State's motion. On appeal, Daengbunga claims the introduction of his previous conviction "was prejudicial and misleading," and the circuit court abused its discretion by granting the State's motion. However, we find no abuse of discretion and affirm the circuit court's judgment.

¶36. We begin by noting that "[a] trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." *Shell-Blackwell v. State,* 305 So. 3d 1211, 1219 (¶23) (Miss. Ct. App. 2020). Moreover, "[w]here error involves the admission or exclusion of evidence, the reviewing court will not reverse unless the error adversely affects a substantial right of a party." *Id*.

¶37. In accordance with Mississippi Rule of Evidence 404(b)(1), "[e]vidence of a crime,

14

wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* However, that same evidence may be admissible for some other purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Shell-Blackwell*, 305 So. 3d at 1219 (¶23) (quoting MRE 404(b)(2)). Additionally, it should be noted that "[t]he purposes listed in Rule 404(b) are not exhaustive; they simply are examples of noncharacter purposes for which evidence of other crimes, wrongs, or acts may be admitted." *Johnson v. State*, 204 So. 3d 763, 768 (¶14) (Miss. 2016).

¶38. This Court "utilizes a two-part analysis to determine whether the admission of other crimes, wrongs, or acts was proper." *Shell-Blackwell*, 305 So. 3d at 1222 (¶32). First, "the evidence offered must not be admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." *Id.* (quoting *Johnson*, 204 So. 3d at 768 (¶15)). Second, the probative value of the proffered evidence must not be "substantially outweighed by a danger of unfair prejudice." *Johnson*, 204 So. 3d at 768 (¶15) (quoting MRE 403). Thus, "the evidence was admissible at trial if it was relevant to a noncharacter issue and its probative value" was not substantially "outweighed [by a danger of an unfair] prejudicial effect." *Stone v. State*, 94 So. 3d 1078, 1084 (¶18) (Miss. 2012).

¶39. We conclude that the circuit court did not abuse its discretion in finding that the evidence of Daengbunga's previous assault was relevant and admissible for non-character

15

purposes. In granting the State's motion, the circuit court reasoned that evidence of Daengbunga's prior assault on Crawford was relevant to Daengbunga's "motive, intent and his claim of self-defense" in the case with Boggs, satisfying Rule 404(b)(2)'s requirement for a relevant purpose. The court also noted that both cases "involve[d] severe facial attacks on women [Daengbunga] was living with, with a particular focus on the eyes," and that both victims had "bite marks to the face."

¶40.    Moreover, the circuit court reasoned that the evidence was admissible under Rule 403, as both cases involved "very serious facial injuries to women." Furthermore, the court emphasized the fact that Boggs was killed "only four months after [Daengbunga] was released from prison after pleading guilty to the Jones County case." Thus, we find that the circuit court made no reversible error in the "two-part analysis to determine whether the admission of other crimes, wrongs, or acts was proper." *Shell-Blackwell*, 305 So. 3d at 1222 (¶32).

¶41.    Here we find no abuse of discretion by the circuit court. The circuit court determined that the evidence was offered for a relevant purpose under Rule 404(b)(2) and determined that the evidence was admissible under Rule 403. We affirm those findings. The evidence of Daengbunga's previous assault on Crawford was relevant to his motive, intent, and claim of self-defense in the case with Boggs, and its probative value was not substantially outweighed by a danger of an unfairly prejudicial effect.

**CONCLUSION**

16

¶42. For the reasons above, we affirm Daengbunga's convictions and sentences. Daengbunga was not subjected to "custodial interrogation" by law enforcement officers while at the hospital, and therefore none of his statements to Smith or Hodek were obtained in violation of his *Miranda* rights. Consequently, the circuit court did not err by denying his motion to suppress. Furthermore, we find no abuse of discretion in the admission of Daengbunga's prior bad acts. The evidence was offered for a relevant non-character purpose, and the circuit court did not abuse its discretion by ultimately determining its probative value was not substantially outweighed by the danger of an unfairly prejudicial effect. Accordingly, we find no error by the circuit court.

¶43. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**