RANDOLPH, Presiding Justice, for the Court:
¶ 1. Before the Court is Joe Morgan’s direct appeal of his convictions of murder of Damien Talbert and manslaughter of Ricky Thomas. Morgan received a life sentence for the murder conviction and twenty years’ incarceration for the manslaughter conviction. Morgan challenges the denial of his requested jury instruction on imperfect self defense and the denial of his motion for a mistrial. Finding that both claims lack merit, we affirm his convictions and sentences.
FACTS
¶ 2. On Saturday, January 8, 2011, Chris Don’s nightclub in Clarksdale, Mississippi, hosted a rap music convention. Morgan attended with his seventeen-year-old brother, Octavius Morgan, and some friends, including Eric Hawkins. In the early morning hours of January 9, 2011, a large fight broke out on the dance floor in Chris Don’s. The fray expanded through the exit door and onto the sidewalk and street in front of the club. The fight culminated in shots being fired, resulting in the deaths of Damien (“DD”) Talbert and Ricky Thomas.
¶ 8. Clarksville Police Officer Delarian Norsworthy received a report of the disturbance around 1:15 a.m. When Norswor-thy arrived, he observed some people standing outside the club and the fight still going on inside. Norsworthy announced that the club was being shut down and that everyone needed to leave immediately. Norsworthy testified that he was standing near the door watching the crowd exit when he heard shots being fired. Not knowing whether the shots were fired inside or outside the club, Norsworthy got down low near the main door to the club. When he exited the club, Norsworthy saw Talbert lying unresponsive on the street and saw another man being loaded into a car and driven away.
¶4. Witnesses presented conflicting accounts of what happened that night. Latonya (“Nick”) Booker testified that she was standing with Talbert inside Chris Don’s when a fight broke out on the dance floor. They backed up to avoid being involved in the fight, but Talbert “still end[ed] up getting involved in it. He tried to keep somebody from getting jumped, but they still end[ed] up getting jumped.” Booker testified that they then went outside, where Talbert was talking to a group of boys, when Thomas approached and said “Ah hell naw.” Thomas then “jumped up and he stole on [Talbert] ... and the group [of] boys [that] was already standing talking to him, was jumping on [Talbert] too.” Booker testified that Talbert and Thomas then “come out from the crowd, and they come from between these cars” parked in front of Chris Don’s. Talbert was on Thomas’s back and Thomas was holding onto Talbert’s shirt, when Booker heard a shot and ran. Booker testified that she did not see who fired the shots.
¶ 5. Andreana Roby, the mother of Tal-bert’s children, testified that she saw Tal-bert helping someone named “Duke-Boy” fight a group of men inside Chris Don’s. When the State inquired, “[w]ho was the Duke-Boy in a fight with,?” she responded “All the Ghost Boys.”[1] Roby also testified *621 that she saw Derrick Ross hit Talbert on the nose with a bottle during the fight inside the club. She testified that she watched Talbert walk out of the club with Booker shortly before she walked out and encountered a large fight on the sidewalk in front of the door. The State asked Roby “[w]ho was fighting out there then?” and she responded that “it was so many people that night, and they all had on dark clothes.... And it was a lot of more boys, and they was all fighting [Talbert].” Roby testified that she and her friends were standing outside when she saw Derrick Ross on the sidewalk. She heard Ross say “Shoot that bitch[,]” and saw Ross pass a gun to Morgan. She testified that she saw Morgan fire the gun.
¶ 6. After defense counsel objected to Roby’s testimony that Talbert had been fighting a group of men dressed in black, whom she identified as “the Ghost Boys,” the trial judge held a conference with the attorneys outside the jury’s presence to discuss Roby’s testimony and the admissibility of gang-related evidence. Morgan’s attorney argued that, although Roby had not used the word “gang,” the jury knew that her identification of a large group of men dressed in black as “the Ghost Boys” was a reference to gang involvement, particularly because jurors were informed during voir dire that evidence of gang involvement might be presented at trial. Defense counsel argued that:
we’re in a position now to where we’ve either got to continue now to open that door to try and explain it ... and/or hope that the jury doesn’t connect that dot to the defendant, but it already has been.
We feel that has prejudiced us, and hamstrung us.
The trial judge denied defense counsel’s motion for a mistrial, finding that Roby’s statement was not an intentional introduction of evidence of gang involvement by the State and that Roby’s statement that Talbert was fighting with men dressed in black was independent of her account of Morgan shooting Talbert with a gun given to him by Ross.
¶ 7. Kurtencia (“Tai-Tai”) Perryman testified that multiple fights broke out in Chris Don’s. She “backed up out the door, because I was eight months pregnant.” She was standing at the door when she saw her brother, Virgil (“Man-Man”) Alford, and got him to go outside. Kurtencia testified that, when she was standing outside, she saw Talbert talking to some boys, that Thomas ran up and started fighting with Talbert near the door to Chris Don’s. There “was just a big crowd of folks fighting. Them the only two people I just really spotted out.” Thinking that Alford may have been involved in the fight, Kur-tencia watched the fight to see whether Alford was involved so she could make him leave. She then saw Talbert on top of Thomas and heard gunshots being fired. Kurtencia testified that she saw Morgan fire the shots.
¶ 8. Octavius testified that he was leaving the club with Morgan and Hawkins when Alford and Latravion (“Tray-80”) Perryman, Kurtencia’s brothers, began a fight with Morgan in the doorway. Octavi-us testified that he joined the fight to help his brother, and that he never lost sight of Morgan the whole time. Octavius was fighting Alford, and Morgan was fighting Latravion, in the doorway of the exit of Chris Don’s when Octavius heard gunshots from the entrance side of the club. He testified that he was watching Morgan the entire time and that he did not see Morgan with a weapon that night. He stated that, *622 when he heard the gunshots, he and the men with whom he had ridden to the club, including Morgan and Hawkins, all ran to the vehicle and left. Octavius also testified that he did not see Ross at Chris Don’s that night. Octavius further testified that Morgan had known Thomas for about seven years and that the two generally were on friendly terms.
¶ 9. Hawkins testified that Talbert and Thomas were fighting in the doorway of Chris Don’s, and that the fight then spilled outside of the club. He testified that Morgan was fighting Latravion and Alford in the exit doorway, and that the fight was escalating just outside of the doorway when the shots were fired. Hawkins testified that he heard the shots as soon as he got outside, that his eyes were on Morgan the entire time, and that he did not see Morgan with a weapon at any time that night. Hawkins testified that, upon hearing the gunshots, he ran to his vehicle and left with the men who had ridden to the club with him that evening.
¶ 10. Morgan later questioned Police Sergeant Norman Starks regarding gang activity. Starks testified that the Ghost Boys, Vice Lords, and Mafia Vice Lords gangs generally were allies with one another, and that they were rivals with the Gangster Disciples and Gangsters. Stark testified that Morgan was a member of the Ghost Boys, and Ross a member of the Mafia Vice Lords, while Talbert and La-travion Perryman were members of the Gangster Disciples and the Gangsters, respectively. No evidence was adduced regarding Ricky Thomas’s gang involvement.
ISSUES
¶ 11. Morgan raises two issues on appeal:
1. Whether the trial court abused its discretion and denied Morgan the opportunity to present an alternate theory of defense by denying his requested jury instruction on imperfect self defense.
2. Whether the trial court abused its discretion by failing to grant a mistrial because a witness called by the State testified about gang activity without laying the proper foundation.
DISCUSSION
¶ 12. We apply an abuse-of-discretion standard when reviewing a trial court’s denial of a jury instruction and a trial court’s denial of a mistrial. Clayton v. State, 106 So.3d 802, 804 (Miss.2012) (‘When reviewing a trial court’s grant or denial of a jury instruction, this Court considers the jury instructions ‘as a whole to determine if the jury was properly instructed, giving abuse-of-discretion deference to the trial judge’s decision’ ” (citation omitted)); Clark v. State, 40 So.3d 531, 538 (Miss.2010) (“The decision of whether to grant a mistrial lies within the sound discretion of the trial court, and the trial court’s refusal to grant a mistrial is reviewable on appeal for abuse of discretion.” (citation omitted)).
I. The trial court did not abuse its discretion by refusing to give Morgan’s requested imperfect-self-defense jury instruction, because the instruction was without foundation in the evidence.
¶ 13. Morgan argues that the trial court abused its discretion by denying his requested jury instruction on imperfect self-defense,[2] because, based on the testi *623 mony that Chris Don’s was generally chaotic and dangerous that night; that Morgan was on friendly terms with Thomas; and that Talbert, who was much larger than Thomas, was on top of Thomas when the two were shot, the jury “could have inferred ... that Morgan shot Talbert in defense of Thomas with a real, but unreasonable belief that it was necessary to save Thomas’s life.”
¶ 14. We conclude that the trial court did not abuse its discretion by refusing to instruct the jury on imperfect self-defense, because the requested instruction was without foundation in the evidence. We have provided that “[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which [1] incorrectly states the law, [2] is covered fairly elsewhere in the instructions, or [3] is without foundation in the evidence.” Bailey v. State, 78 So.3d 308, 315 (Miss.2012) (citation omitted).
¶ 15. Morgan did not present an imperfect-self-defense theory through witness testimony or introduce “evidence that a jury could infer that Morgan feared for Thomas’s life that night.” Morgan presented testimony from three witnesses: Sergeant Norman Starks, Octavius Morgan, and Eric Hawkins.[3] Starks testified regarding his knowledge of local gangs and the gang affiliations of Talbert, Morgan, Ross, and others who were present at Chris Don’s that night. Morgan’s counsel told the trial judge that he was eliciting testimony regarding Ross to respond to
earlier testimony that Morgan had shot Talbert at Ross’s command, because of “the influence [Ross] would have over another [gang member], for a manslaughter.” (Emphasis added.) Stark testified that it is not unusual for a member of a gang to carry out a task because “a commander, or a leader, or [another] member” asked him to do so, “as a sign of loyalty[.]”
¶ 16. Not one witness testified or implied that Morgan killed Talbert to protect Thomas that night. Morgan’s incident witnesses testified that their eyes were on Morgan at all times, and that they did not see a weapon in his possession. Evidence was presented that Morgan was acquainted with Thomas. Octavius testified that Ricky Thomas was a friend of his brother, and that Thomas and his brother “[n]ot ... ran together ..., but they used to be together every now and then[.]” Hawkins, who had known Morgan for about seven years and was good friends with Morgan, testified that he did not know whether Morgan was friends with Thomas. Moreover, neither Octavius nor Hawkins described any reaction by Morgan to the fight between Talbert and Thomas. Neither testified that Morgan was even aware that Talbert was fighting with Thomas. Both Octavius and Hawkins testified that they were with Morgan when they heard the gunshots, that they watched him the entire time, and that they did not see him with a gun that night. Thus, the only theory presented through witnesses called by the defense was that Morgan was not the shooter. Morgan presented no evidence that Morgan feared Talbert or believed Talbert to be a threat to Thomas, *624 or, for that matter, that Morgan even was aware that Talbert was prevailing in a fight with Thomas, to provide a foundation for the requested instruction.
¶ 17. Morgan argued that the State had failed to present sufficient evidence to prove beyond a reasonable doubt that Morgan was the shooter. Morgan argued in the alternative that, if the jury found that Morgan did shoot Talbert, it should convict him of manslaughter, because the shooting “was in the heat of passion, uncontrollable anger” and “[t]he Gangsters were fighting rival gangs. If you believe the defendant did it, he didn’t calculate it. He didn’t plan it. That’s not deliberate design. It is a heat of passion.” Morgan argued that Morgan shot Talbert because he was enraged and impassioned that Tal-bert was fighting Thomas, not because he had a bona fide, though mistaken, belief that shooting Talbert was necessary to prevent Thomas from suffering death or great bodily harm. As Morgan failed to present evidence to support an imperfect-self-defense theory, his requested instruction was without foundation. Thus, we discern no abuse of discretion by the trial court in refusing the instruction.
¶ 18. Nor did the requested instruction have foundation in evidence presented by the State. Two of the State’s witnesses, Roby and Kurtencia Perryman, testified that they had seen Morgan fire the shots. Roby testified that she had witnessed Ross giving Morgan a gun and instructing Morgan to “Shoot that bitch” moments before she saw Morgan shooting, and Kurtencia simply testified that she had heard gunshots and had seen Morgan shooting. Neither testified that she had observed Thomas in danger of death or sei’ious bodily harm.
II. The trial court did not abuse its discretion by denying Morgan’s motion for a mistrial, because the challenged testimony did not irreparably and substantially prejudice his case.
¶ 19. We find that the trial court did not abuse its discretion by denying Morgan’s motion for a mistrial based on Roby’s mention of “the Ghost Boys.” Morgan argues that the trial court abused its discretion by denying his motion for a mistrial, because “Roby’s testimony left the jury with the inference that the Ghost Boys were dressed in dark clothes ... and Morgan was a member of that gang.” (Emphasis added.) He asserts that “the prosecution did not lay the proper foundation to show that Roby was aware of gang life, that she knew gang members, or that she had any other personal knowledge of ‘the Ghost Boys[,]’ ” in violation of Mississippi Rule of Evidence 602. (Citing Hoops v. State, 681 So.2d 521, 531 (Miss.1996)). Morgan cites Hoops for the proposition that, under Rule 602, the State had to lay a proper foundation before Roby mentioned “the Ghost Boys.”
¶ 20. Rule 602 provides, in relevant part, that “[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter.” Miss. R. Evid. 602. At issue in Hoops was whether the State had laid the proper foundation for evidence of gang involvement to be introduced before eliciting testimony that the defendant was a member of a particular gang. Hoops, 681 So.2d at 531. In contrast, here, the State did not elicit testimony from Roby that Morgan was a member of a particular gang. Rather, Morgan’s argument is that the State violated Rule 602 by failing to lay a proper foundation before Roby made a statement from which the jury could have inferred, that Morgan was involved with a gang. We find that the trial judge did not abuse his discretion by finding that this potential inference did not warrant a mistrial.
*625 ¶21. The State did not introduce evidence to support a finding that Roby had personal knowledge of Morgan’s affiliation with a gang. The State had not laid a foundation for evidence of Morgan’s gang membership prior to Roby’s mention of “the Ghost Boys[,]” because the State did not question Roby regarding Morgan’s membership in a gang. Roby referenced the Ghost Boys while being questioned by the State regarding her observations of how the fight began. Roby responded that she had not seen what had started the fight, but that she had seen Talbert “helping the little Duke-Boy.” The State asked her who Duke-Boy had been fighting, and she responded “All the Ghost Boys.” Morgan objected and renewed his motion for a mistrial, because “[s]he just blurted it out, without any basis or personal knowledge— just says the Ghost Boys. Here we go about the gangs.” The trial judge declined to grant a mistrial and further found that Roby’s comment did not warrant a jury instruction to disregard it.[4] The trial judge was “not totally convinced that the jury is associating [Roby’s mention of ‘the Ghost Boys’] with gang activity.” He stated that “[i]f I give some kind of instruction, it’s just going to highlight what happened[,]” to which Morgan’s counsel responded, “I agree.”
¶ 22. Under these facts, we cannot say that the State’s failure to lay a foundation for gang evidence before Roby’s mention of “the Ghost Boys” — which Morgan recognizes “she just blurted ... out” — warranted a mistrial. Roby blurted out the statement in response to general questioning regarding her observations of the fight that preceded the shooting deaths of Tal-bert and Thomas. After Morgan objected, Roby was instructed “not to mention anything [regarding gangs].” Neither Roby nor any subsequent witness called by State made further mention of “the Ghost Boys” or gang activity.
¶ 23. The mention of the Ghost Boys, in the absence of evidence laying a foundation for her knowledge of gang activity, did not irreparably and substantially prejudice Morgan. See Clark v. State, 40 So.3d 531, 538 (Miss.2010) (“If the trial court determines that error occurred in the proceedings that substantially and irreparably prejudiced the defendant’s case, the court must grant a mistrial.” (citation omitted)). We have provided that “the trial judge is permitted considerable discretion in determining whether a mistrial is warranted because the judge is best positioned to measure the prejudicial effect.” Harrell v. State, 947 So.2d 309, 316 (Miss.2007) (citation omitted). Here, the trial judge found that drawing attention to Roby’s passing reference to Talbert’s fight with “the Ghost Boys,” by instructing the jury to disregard it, could have been more prejudicial than the statement itself had been — and Morgan’s counsel agreed. While Roby did testify that Morgan was dressed in dark clothing, she did not use the word “gang.” She did not testify that Morgan was a member of the Ghost Boys. Indeed, the State presented no evidence that the Ghost Boys was a gang. Morgan was not among the men wearing dark clothing who Roby testified were fighting with Talbert. Thus, Roby’s suggestion that the group of men with whom Talbert was fighting outside of Chris Don’s — a group that did not include Morgan — was affiliated with the Ghost Boys did not implicate Morgan, for, at that point, no evidence had been introduced regarding Morgan’s or Talbert’s putative gang affiliation. *626 We find that Roby’s brief reference to the Ghost Boys did not substantially and irreparably prejudice Morgan’s right to a fair trial. Accordingly, we conclude that the trial court did not abuse its discretion by denying Morgan’s motion for a mistrial.
CONCLUSION
¶ 24. The trial court did not abuse its discretion by denying the requested imperfect-self-defense instruction, which had no foundation in the evidence. The trial court did not abuse its discretion by denying the motion for a mistrial, for the challenged testimony did not irreparably and substantially prejudice Morgan’s right to a fair trial. Accordingly, we affirm Morgan’s convictions and sentences in the Coahoma County Circuit Court.
¶ 25. COUNT I: CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY TO SENTENCE IN COUNT I.
WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.

. The State then asked "What group?!,]” at which point defense counsel objected and moved for a mistrial, arguing that the State had "introduced into evidence this thing about the gang-issue that we discussed prior to trial” without making any "presentation at all of personal knowledge of this witness of *621 any gangs” and "[n]ow it’s out into the jury's ears. There’s no way we can take it out.”

. The requested instruction read as follows: The Court instructs the jury that under the law, a Defendant may have what is known as an "imperfect self defense.” What this means is that under the law the “imperfect self-defense", an intentional killing may be considered manslaughter if done without malice but under a bona fide, but unfound *623 ed, belief that it was necessary to prevent death or great bodily harm. If you find in this case that the proof shows that the Defendant killed the deceased Damien Talbert, without malice, under a bona fide, but unfounded belief that it was necessary for the Defendant to do so in order to prevent the said Damien Talbert from inflicting death or great bodily harm upon Ricky Thomas, then you must find the Defendant, Joe Morgan, guilty of manslaughter as to Count I due to imperfect self-defense.

. Morgan did not testify at trial.

. "The trial judge may alleviate the potential damage of [improper] testimony by addressing the statement with the jury, instead of declaring a mistrial.” Strickland v. State, 784 So.2d 957, 964 (Miss.2001) (citation omitted).