# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CT-00835-SCT

*DERRICK NELSON a/k/a DERRICK DEMETRIUS*
*NELSON*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT: 05/19/2016
TRIAL JUDGE: HON. JAMES T. KITCHENS, JR.
TRIAL COURT ATTORNEYS: ARMSTRONG WALTERS
TRINA DAVIDSON-BROOKS
BRANDON LANGFORD
DONNA SMITH
COURT FROM WHICH APPEALED: LOWNDES COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: J. MATTHEW EICHELBERGER
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: ALICIA AINSWORTH
DISTRICT ATTORNEY: SCOTT WINSTON COLOM
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: THE JUDGMENT OF THE COURT OF
APPEALS IS REVERSED. THE JUDGMENT
OF THE CIRCUIT COURT OF LOWNDES
COUNTY IS REINSTATED AND
AFFIRMED - 08/22/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1. Our review of this case arises from Derrick Nelson's murder conviction in Lowndes

County Circuit Court. The Court of Appeals held that the trial court erred by refusing an

imperfect self-defense jury instruction; it reversed Nelson's conviction and remanded for a

new trial. *Nelson v. State*, No. 2016-KA-00835-COA, 2018 WL 5603699, at *1 (Miss. Ct. App. Oct. 30, 2018).[1] The State filed a petition for a writ of certiorari, which we granted. Because no evidentiary basis in the record supports the grant of an imperfect self-defense jury instruction, we reverse the judgment of the Court of Appeals. While the Court of Appeals did not reach Nelson's argument that the State deprived him of a fair trial, we review it and find no reversible error. Thus, we affirm Nelson's murder conviction and sentence of life imprisonment.

## FACTS AND PROCEDURAL HISTORY

¶2. On the evening of May 4, 2013, Nelson was celebrating his younger brother's graduation at his mother's house. Nelson's mother, Chiquita Nelson, two sisters and his mother's boyfriend, Willie Hood, Jr., also attended the party. Everyone had been drinking at the party, including Hood, who was intoxicated.[2] The celebration, though, ended tragically when Nelson shot Hood.

¶3. According to Nelson's statement to Officer George Harris, Nelson and Hood had argued over the keys to Hood's car, which was parked in the driveway. Nelson was attempting to stop Hood from driving. Hood told Nelson that Nelson could have Hood's car because he could get another one. Nelson then took the keys to Hood's car out of the vehicle and held them. Hood then started walking up the street. He returned, though, "hipe[d] up

---

[1] Judge Fair wrote the majority opinion, which was joined by Chief Judge Lee and Judges Barnes, Carlton, Greenlee, Westbrooks and Tindell. Judge Jack Wilson dissented, joined by Judges Irving and Griffis.

[2] It was undisputed at trial that Hood was intoxicated; his blood alcohol content that evening was later determined to be .21 percent.

and talking loud." Nelson maintained that his sister Asia Nelson told him to give Hood's keys back to Hood since Hood would not have had the car if it had not been for her. Nelson stated that he placed the keys in Hood's hand.

¶4. After talking with his mother and Asia about Hood, Nelson walked to the mailbox and called his friend Smiley for a ride. Soon, Smiley pulled up in a white Dodge Charger. Nelson walked back to tell his mother that he was leaving; Asia, Nelson's mother and Hood were arguing. Nelson claimed that Hood was "jumping around talking loud" and tried to break the driver's side window of his car with his bare fist. Hood ended up breaking a wind guard on the vehicle. He also grabbed a beer bottle and threw it in Nelson's direction; the bottle glanced off Nelson's shoulder and burst against the rear window of Hood's car. Nelson's other sister, Kinuna Davis, later told Officer L.C. Cockrell that Hood was hitting his car with a beer bottle, that the beer bottle shattered on Hood's vehicle and that "some of the glass got on" Nelson, upsetting him.

¶5. At that point, Nelson reached into the Charger, which was parked on the street, and withdrew a black handgun from the passenger seat. He held the gun in his right hand, fired two shots[3] into the air and told Hood to "chill out" because he was not trying to hurt him.

¶6. According to Nelson, Hood then walked up to him, and they began to wrestle.[4] Nelson stated that they locked up and wrestled from the back of Hood's vehicle to the front.

---

[3] Davis told Officer Cockrell that Nelson fired three or four shots. Officer Austin Shepard recovered four shells from the crime scene.

[4] In her statement after the shooting, Davis told Officer Cockrell that Hood walked away from Nelson after the shots were fired and started to "go around his car." At trial, she testified that she recalled saying this to Officer Cockrell.

3

Nelson told officers that the "gun went off" when they fell back onto the hood of the car. Dr. Brent Davis, a forensic pathologist, later determined that the cause of Hood's death was a gunshot wound to the head. Davis also determined that Hood's death was a homicide.

¶7. Nelson recounted that he did not really remember what happened after the shot. He stated that he was standing there in shock and that he threw his hands into the air. When his hands went up, Nelson stated that the gun left his hands. Asia and Davis testified that Nelson threw the gun over a fence. Officer Harris later recovered the gun on the other side of the fence that bordered an adjacent lot.

¶8. After the shooting, Nelson got into the Charger and drove away. Smiley dropped him at a friend's house. Later, Nelson called Chief McQueen who went and picked Nelson up from his friend's house.

¶9. At trial, Davis failed to recall portions of her statement to Officer Cockrell on the night of the shooting. In her statement that night, Davis had stated that "My brother Derrick Nelson grabbed Willie Hood, Jr.[,] from behind and put his hands around his neck. Derrick place [sic] Willie Hood, Jr.[,] on the car and shot Willie Hood, Jr.[,] in the head." At trial, Davis testified that she remembered having made a similar statement to Officer Cockrell but that she did not remember its actually having happened that way.[5]

¶10. Davis did testify, though, that Hood "always acts, you know, crazy. We're used to that." She stated that Hood's acting crazy meant that "he beats up on things. Himself, you know, stuff like that. He does things like that." Also, Davis testified that Hood "kind of

---

[5] The trial court granted a limiting instruction that told the jury that it could only consider as impeachment evidence the portions of Davis's prior statement that she recanted or that she could not recall having made.

turned up a little bit after" Nelson fired the gun into the air. Ultimately, though, Davis did not recall the specifics of the actual fight. The following exchange took place on cross-examination:

Counsel:     But today as you sit in the stand, do you know how the actual altercation that ended up with Willie Hood being shot? [sic]

Davis:     No.

Counsel:     Do you recall seeing exactly what happened?

Davis:     No.

¶11.   Similar to Davis, Asia—when testifying at trial—did not recall portions of the statement she had made to Officer Watkins on the night of the shooting. She testified that she had told Officer Watkins that "I then seen [sic] Derrick walk up and shoot Willie Hood in the head." At trial, though, she testified that the shooting had actually occurred when Nelson and Hood were fighting and that her prior statement to Officer Watkins did not accurately describe the shooting.[6]

¶12.   Asia also testified that the argument that evening was "normal. It's always arguments and altercations" between Chiquita, Nelson and Hood  She did testify, though, that after Nelson fired the gun in the air, Hood grabbed Nelson "like . . . why did you shoot the gun in the air type of grab." According to Asia, after Hood grabbed Nelson, the argument moved from the street to the front yard "[a]nd it was the same argument, like what happened in the road . . . ." When asked if she meant the argument was a verbal argument after the gun had been fired, Asia replied, "Yes, sir." Also, when asked how far apart Hood and Nelson were

---

[6] The limiting instruction also applied to those portions of Asia's statement that she recanted or that she could not recall having made.

5

in the argument in the front yard after the first shots had been fired, Asia replied, "They were like face-to-face."

¶13. Regarding the fight along Hood's vehicle, Asia testified that at the front of the car the fight was "just wild." She testified that she did not see the shooting but only saw Hood on the ground after hearing the gunshot.

¶14. Further, Asia recounted similar altercations between Hood and Nelson in the past. In those altercations, Asia testified that it was "[j]ust wild swinging" by Hood. Asia also stood up from the witness stand to demonstrate what she meant by "wild swinging": "Just swinging like, just every where [sic]."

¶15. Nelson was indicted for murder and was tried. The trial court instructed the jury on first-degree murder, second-degree murder, misdemeanor manslaughter, heat-of-passion manslaughter, culpable-negligence manslaughter, accident, and self-defense. Nelson requested that the jury also be instructed on imperfect self-defense. While the trial court originally granted an imperfect self-defense instruction, it later withdrew the instruction and refused it.

¶16. The jury convicted Nelson of first-degree murder. Nelson appealed, and we assigned the case to the Court of Appeals. Nelson raised three issues. First, he argued that the trial court erred in refusing the imperfect self-defense jury instruction. Second, he argued that the State commented on Nelson's silence in closing argument and deprived him of a fair trial. Third, he argued that the evidence was insufficient to support the jury's verdict. The Court of Appeals held that the evidence was sufficient to sustain a first-degree murder conviction, but it reversed Nelson's conviction, due to the trial court's refusal of the imperfect self-

6

defense instruction, and remanded the case for a new trial. The State filed a petition for a writ of certiorari, which we granted.

¶17. After review, we reverse the judgment of the Court of Appeals because no evidentiary foundation in the record supports the grant of an imperfect self-defense instruction. We do agree, however, with the Court of Appeals that the evidence is sufficient to support the murder conviction. Since the Court of Appeals did not reach Nelson's fair-trial issue, we review it, and we find no reversible error. Thus, we reverse the decision of the Court of Appeals, and we affirm Nelson's murder conviction and sentence.

## ANALYSIS

### I. Imperfect Self-Defense Jury Instruction

¶18. "Jury instructions are generally within the discretion of the trial court and the settled standard of review is abuse of discretion." *Bailey v. State*, 78 So. 3d 308, 315 (Miss. 2012) (citing *Newell v. State*, 49 So. 3d 66, 73 (Miss. 2010)). Jury instructions "are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found." *Id.* (internal quotation marks omitted) (quoting *Young v. State*, 891 So. 2d 813, 819 (Miss. 2005)). We have "held that '[a] defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.'" *Id.* (quoting *Hearn v. State*, 3 So. 3d 722, 738 (Miss. 2008)).

¶19. We have recently noted the distinctions between self-defense and imperfect self-

7

defense:

> Self[-]defense or justifiable homicide is a *defense* to a criminal act. ***Ronk v. State***, 172 So. 3d 1112, 1126 (¶ 22) (Miss. 2015). "Self-defense is codified at Mississippi Code Section 97–3–15(f), which provides that the killing of a human being is justifiable '[w]hen committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.'" ***Byrd v. State***, 158 So. 3d 1146, 1151 (¶ 16) (Miss. 2015) (quoting Miss. Code Ann. § 97–3–15(f)). "The apprehension or fear that will justify killing another in self-defense must appear objectively real to a reasonable person of average prudence." ***Batiste v. State***, 121 So. 3d 808, 845 (¶ 74) (Miss. 2013). Stated another way, "[t]he actor's apprehension must be objectively reasonable before his homicide is justified." ***Cook v. State***, 467 So. 2d 203, 207 (Miss. 1985).

> "Unlike true self-defense, imperfect self-defense is *not a defense* to a criminal act." ***Ronk v. State***, 172 So. 3d 1112, 1126 (¶ 22) (Miss. 2015). "Rather, under the theory of imperfect self-defense, an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." ***Id.*** Contrary to the objective reasonableness of an actor engaged in true self-defense constituting a justifiable homicide, "[w]here [an] actor's apprehension is only subjectively, in his or her own mind, reasonable, the homicide is Section 97–3–35 [heat of passion] manslaughter." ***Cook***, 467 So. 2d at 207. Thus, "the homicide is manslaughter where the defendant acted under the bona fide belief of necessity, without objectively reasonable cause therefor[.]" ***Id.***

***Brown v. State***, 222 So. 3d 302, 307 (Miss. 2017) (alterations in original) (footnote omitted).

Thus, a trial court does not "abuse its discretion by refusing to instruct the jury on imperfect self-defense . . . [when] the requested instruction [is] without foundation in the evidence."

***Morgan v. State***, 117 So. 3d 619, 623 (Miss. 2013).

¶20.    Here, there is no foundation in the evidence for an imperfect self-defense instruction. Nelson did not present an imperfect self-defense theory. No evidence—testamentary or otherwise—was presented from which a jury could have determined that Nelson "killed . .

8

. Hood without malice, under a bona fide, but unfounded belief that it was necessary . . . to prevent . . . Hood . . . from inflicting death or great bodily harm upon Derrick Nelson."

¶21.    There is no evidence in the record of Nelson's "bona fide . . . belief that it was necessary" to kill Hood.  Aside from Nelson's argument that the shooting was in self-defense (a defense that is only concerned with whether the defendant's belief is objectively reasonable),[7] Nelson advanced a theory of an accidental shooting.  He relied on his statement to Officer Harris that the gun just "went off."  No testimony or other evidence at trial supported the conclusion that Nelson had believed it necessary to kill Hood.[8]

¶22.    Further, no witness testified or implied that Nelson shot Hood in order to protect himself.  Davis testified that she did not recall seeing exactly what happened and did not know how Hood ended up being shot.  Likewise, Asia did not see Hood's being shot; she only saw Hood on the ground after hearing the gunshot.

¶23.    There is no evidence in the record from which the jury could have inferred that Nelson felt threatened by this particular argument with Hood.  The only differentiating factor in this

---

[7] The issue of whether there is an evidentiary foundation in the record to support the grant of Nelson's self-defense instruction is not before us.

[8] Besides her argument on actual self-defense, defense counsel agreed with this conclusion.  In closing argument, defense counsel stated,

> There's no evidence in front of you that Derrick Nelson intended to fire that gun.  There's no evidence in front of you that he decided well, I'm just going to kill this guy.
>
> . . . .
>
> The only evidence you have in front of you is that there was a fight, a physical fight, and Willie Hood was shot.  We submit to you that that was an accidental shot.  Nobody intended that gun to go off.

9

altercation and past altercations was Nelson's decision to introduce a firearm into the ruckus after the beer bottle smashed on Hood's vehicle, spraying Nelson with some glass.

¶24.    The evidence on which the Court of Appeals relied as an evidentiary foundation for the instruction is insufficient. *Nelson*, 2018 WL 5603699, at *2–4. No reasonable juror could have inferred what Nelson's subjective belief was concerning the necessity to shoot Hood. Without any evidence of Nelson's bona fide belief that it was necessary to kill Hood to protect himself, there is no foundation in the evidence for the grant of the imperfect self-defense instruction.

¶25.    Indeed, the actual evidence of Nelson's *subjective* belief supports the trial court's refusal of the instruction. In her statement to Officer Cockrell, Davis recounted that Nelson "got upset" after the beer bottle smashed. Also, according to Nelson, he told Hood to "chill out" after firing the handgun and that no one was trying to hurt him. Further, Nelson maintained that he "was just standing there in shock" after the gun "went off." These indications of Nelson's subjective belief about the shooting do not support the theory that Nelson killed Hood under a belief that doing so was necessary to his self-defense.

¶26.    We emphasize that Mississippi law provides that "every accused has a fundamental right to have [their] theory of the case presented to a jury, even if the evidence is minimal." *Chinn v. State*, 958 So. 2d 1223, 1225 (Miss. 2007). Also, "[i]n homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely." *Brown*, 39 So. 3d at 899 (internal quotation marks omitted) (quoting *Evans v. State*, 797 So. 2d 811, 815 (Miss. 2000)). Nelson, though, had to offer some evidence to support his imperfect self-defense

10

theory before the trial court was obligated to instruct the jury on it. *See **Drake v. State***, 800 So. 2d 508, 518 (Miss. 2001) ("[A] lesser-included offense instruction should never be granted on the basis of pure speculation." (internal quotation marks omitted) (quoting ***Fairchild v. State***, 459 So. 2d 793, 801 (Miss. 1984))). The trial court here realized this and instructed the jury that the "verdict should be based on the evidence and not upon speculation, guesswork, or conjecture." The jury would have been forced to speculate or guess as to Nelson's subjective belief given the record evidence here. For instance, the Court of Appeals' reliance on the weight disparity between the two men, Hood's actions that night and in the past and Nelson's flight from the scene do not support the inference that Nelson *subjectively* believed that it was necessary to kill Hood to protect himself.[9] ***Nelson***, 2018 WL 5603699, at *2. There simply was no evidence of Nelson's subjective belief that it was necessary to kill Hood. Thus, the trial court properly refused the imperfect self-defense instruction.

## II. Defendant's Right to Remain Silent

¶27. Nelson alleges that the prosecutor deprived him of a fair trial by commenting during closing argument on Nelson's decision to not testify. The State responds that the prosecutor did not comment directly on Nelson's failure to testify and did not imply that Nelson's

---

[9] Recall that the trial court instructed the jury on self-defense. In deliberations, the jury was in a position to look at this evidence from an objective standard to determine if Nelson had acted in self-defense. The jury rejected this theory. Further, we acknowledge that a defendant's subjective belief can be shown by evidence other than the defendant's own testimony. Evidence that the defendant *subjectively* believed that self-defense was necessary could come in any number of forms at trial. Here, though, no such evidence was entered at trial from which the jury could infer Nelson subjectively believed that it was necessary to kill Hood in order to protect himself.

silence was improper or indicative of guilt.

¶28.    "A criminal defendant has the right to elect not to take the witness stand in his own defense." *Wright v. State*, 958 So. 2d 158, 161 (Miss. 2007) (citing Miss. Const. art 3, § 26; U.S. Const. amend. V). "Balanced against this constitutional interest is the rule that attorneys are to be given wide latitude in making their closing arguments." *Id.* "[T]his Court has recognized that a direct comment on a defendant's failure to testify is not allowed and constitutes reversible error." *Jimpson v. State*, 532 So. 2d 985, 991 (Miss. 1988) (citing *Livingston v. State*, 525 So. 2d 1300, 1305–08 (Miss. 1988), *overruled by Wright*, 958 So. 2d at 164–65). "There is a difference however, between a comment on the defendant's failure to testify and a comment on the failure to put on a successful defense." *Id.*

¶29.    Thus, "[t]he question is whether the prosecutor's statement can be construed as commenting upon the failure of the defendant to take the stand." *Wright*, 958 So. 2d at 161 (citing *Ladner v. State*, 584 So. 2d 743, 754 (Miss. 1991)). "When the statement is not an outright violation, this Court will review the facts on a case-by-case basis." *Id.* at 166 (citing *Logan v. State*, 773 So. 2d 338, 348 (Miss. 2000)). Further, "when considering whether an attorney's comment during opening or closing statements was improper, this Court must determine 'whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created.'" *Anderson v. State*, 62 So. 3d 927, 940 (Miss. 2011) (quoting *Tate v. State*, 20 So. 3d 623, 629 (Miss. 2009)).

A.    **Comments about Smiley**

12

¶30. While discussing the flight jury instruction, the prosecutor commented on the failure of Smiley to testify. The prosecutor argued, "In any event after that, by his own statement, he gets in a car with Smiley. Who apparently Smiley [sic] had been there the whole time and witnessed all of these events. We don't know who Smiley is. I can't issue a subpoena for him." At this point, defense counsel objected, and the trial court overruled the objection. The prosecutor continued,

> But apparently, in his statement—and you can read it, he calls Smiley to come pick him up. So Smiley apparently was there when the shooting occurred, because he immediately got in the car and drove off with Smiley. I still don't know who Smiley is. And I haven't seen Smiley come up here to testify as to what he saw.

¶31. The State did not deprive Nelson of a fair trial by commenting on his failure to testify. The prosecutor's remarks were directed at Nelson's failure to call Smiley to testify, not Nelson's right to remain silent. The comment fit within the prosecutor's argument to explain the flight instruction to the jury and to encourage the jury to infer a "conscious sense of guilt" on Nelson's part. Noting the fact that Smiley did not testify was a "comment on the lack of [a] defense, and such comment will not be construed as a reference to the defendant's failure to testify by innuendo and insinuation." ***Wright***, 958 So. 2d at 161 (citing ***Shook v. State***, 552 So. 2d 841, 851 (Miss. 1989)).

¶32. Also, while it is generally improper to comment on the failure of either party to call a witness who is equally accessible to both parties, "[w]here a defendant fails to call a witness more available to him and presumptively in a closer relationship with him, the state is fully entitled to comment on the party's failure to call the witness." ***Ross v. State***, 603 So.

13

2d 857, 864 (Miss. 1992) (citing *Brown v. State*, 200 Miss. 881, 27 So. 2d 838, 841 (1946)).

In his statement, Nelson told Officer Harris that Smiley was "a friend of mine . . . in from Tuscaloosa, Alabama." As such, Smiley was more available to Nelson and presumptively in a closer relationship with him. Thus, the trial court did not err in overruling Nelson's objection.

### B. Comment about Chiquita Nelson

¶33. At the end of his closing argument, the prosecutor noted that Nelson's mother, Chiquita, was in the front yard during the altercation and shooting. Next, he argued, "And you can attached [sic] whatever weight or importance you choose to attach to it. But the mother of the defendant is not here to testify." Thus, the prosecutor commented on Nelson's decision to not call Chiquita to testify and did not comment on Nelson's right to remain silent. "Without reaching the question of whether the prosecutor's comments were otherwise objectionable, they were not a comment on the defendant's right to remain silent." *Anderson v. State*, 62 So. 3d 927, 941 (Miss. 2011).[10]

### CONCLUSION

¶34. Because no evidentiary basis in the record supports the grant of an imperfect self-defense instruction, we reverse the judgement of the Court of Appeals and find that the trial court did not err in refusing the instruction. Further, after review, we find that the State did

---

[10] Also, as Nelson concedes, defense counsel failed to object at trial to the prosecutor's comment about Chiquita. As such, we decline to review the issue further. *See Dampier v. State*, 973 So. 2d 221, 235–36 (Miss. 2008) (concluding that failure to object to "comments in closing argument creates a procedural bar" when the comments did not infringe on constitutional rights).

not comment on Nelson's right to remain silent.  Thus, we reinstate and affirm Nelson's conviction and his sentence of life imprisonment.

¶35.    **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED.  THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS REINSTATED AND AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM AND ISHEE, JJ., CONCUR.  GRIFFIS, J., NOT PARTICIPATING.**