# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00856-COA

**JOHN SCATES, JR.**                                                                 **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                          **APPELLEE**

DATE OF JUDGMENT:                 10/13/2021
TRIAL JUDGE:                               HON. W. ASHLEY HINES
COURT FROM WHICH APPEALED:    WASHINGTON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        JACOB MICHAEL JENKINS
                                                   A. LEE ABRAHAM JR.
ATTORNEY FOR APPELLEE:            OFFICE OF THE ATTORNEY GENERAL
                                                   BY: CASEY BONNER FARMER
DISTRICT ATTORNEY:                   WILLIE DEWAYNE RICHARDSON
NATURE OF THE CASE:                 CRIMINAL - FELONY
DISPOSITION:                              AFFIRMED - 11/07/2023
MOTION FOR REHEARING FILED:

### BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     After a jury trial, John Scates Jr. was convicted of aggravated assault enhanced by the use of a firearm. He was sentenced to serve twenty years in the custody of the Mississippi Department of Corrections (MDOC) for the aggravated assault conviction, and the court ordered him to serve an additional five-year sentence for the firearm enhancement, set to run consecutively to the twenty-year term. Scates's post-trial motions were denied, and he appealed. On appeal, Scates argues that the trial judge should have (1) ordered a mistrial due to prejudicial comments by the State's key witness, (2) granted his motion for a new trial due to alleged intimidation of a juror by her fellow jurors, and (3) granted his motion for a new

trial because the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm.

## FACTUAL BACKGROUND

¶2.    In 2017, Henry Bates sold a truck to Scates for $7,500, with $5,000 down and the remaining $2,500 to be paid in installments over the course of a few months. On October 19, 2017, Scates still owed Bates a remaining balance of $500. On that day, Bates decided to repossess the truck. Bates drove to Scates's place of employment, Greenville Imports, and with the assistance of Antonio Granger, loaded the truck onto a tow truck and removed it from the lot. When Scates realized the truck was missing, he contacted Bates and agreed to furnish the remaining $500 he owed in return for his truck.

¶3.    Later that evening, Bates returned to Greenville Imports, and an argument ensued when Bates wanted more than just the $500. When Bates was leaving, Scates shot Bates in the back. At 6:25 p.m., the Greenville Police Department responded to the scene. Bates, Scates, Antonio Granger, and a man named Christopher Buford were at the scene. Scates was cooperative, and the Greenville Police Department took him into custody. Scates was arrested and subsequently indicted for the crime of aggravated assault with a firearm enhancement. Scates's trial took place from May 25- 26, 2021.

¶4.    At trial, the State called Sharon Jones, the dispatch supervisor for the Greenville Police Department. She authenticated the CAD report[1] detailing the date, time, and location of the 911 call, which was the subject of this incident. That report and the 911 call were

---

[1] CAD reports are computer-aided dispatch systems that police dispatchers and 911 operators use to record incident calls and effectively dispatch police personnel.

introduced into evidence.[2]  Jones testified that a call of "shots fired" came in "On October the 19th, 2017 at . . . 6:20 p.m."  The location of the shooting was "Greenville Imports."  A police officer arrived at the scene at "18:25" (6:25 p.m.).

¶5.    The State's  next witness was Officer Cody Norris, the Greenville police officer who was the first to respond to the scene.  Upon arrival, Officer Norris observed two men: Bates "on the ground in some blood," and Scates "in the building."  He made contact with Bates and observed that he had "two . . . gunshot wounds to the back."  Officer Norris specified these wounds were located in the "small center, lower center of his back."  Officer Norris did not observe a weapon in Bates's vicinity, in his waistband, or on his person. Officer Norris testified there was no indication that Bates possessed a firearm.

¶6.    On cross-examination, Officer Norris testified that aside from Bates and Scates, he could not recall if anyone else was present at the scene. He did recall, however, that he "spoke to somebody else that was not Mr. Scates or Mr. Bates" but could not remember the name of this person. On redirect-examination, after refreshing his memory, he testified that he made contact with four non-law enforcement individuals: Bates, Scates, Granger, and Buford.

¶7.    The State called Antonio Granger to testify next.  Granger testified that on October 19, 2017, he and Bates drove together in Granger's tow truck to Greenville Imports and "picked up a truck that [Bates] had sold to [Scates]."  Granger stated that he stayed outside while Bates went into Greenville Imports to speak to Scates.  Bates left the parking lot in the

_____

       [2]  The 911 phone call was not played for the jury at this time due to issues with the equipment.

3

truck with Granger following behind him in a tow truck.

¶8.     Later that afternoon, Bates called Granger and told him his car had "broke down."[3] Granger assisted Bates in towing his vehicle.[4]  Bates asked Granger if he could return to Greenville Imports because he needed to speak to Scates again.  Granger drove back to Greenville Imports but remained next to his tow truck[5] while Bates went to speak to Scates. Granger stated Bates walked up to Scates's office door, and "once [Bates] got up there [he] could hear them talking."  Granger further testified he was "not paying a whole lot of attention" until he heard Bates and Scates "arguing back and forth."  Granger then heard the first gunshot and could no longer see Bates or Scates.  At this point, Granger started walking toward the building so he could see where Bates was, but once he got around his tow truck, he saw Scates shoot a gun (the second shot Granger heard).  Scates then pointed the gun at Granger and told him to "get back."  Granger observed Bates lying face down on the ground. Granger did not see anything else on the ground other than a yellow envelope.[6]  Granger stated he called 911.  At this point in Granger's testimony, his 911 call was played before the jury.  Granger testified he stood by Bates's side while they awaited emergency personnel. Scates remained in the doorway of his office.  Granger stated that "after the [medical

---

[3] Bates was not driving the truck when this happened; instead, he was driving a Mini Cooper.

[4] Buford, who worked for Granger, was also in the tow truck with Granger at this time. However, as soon as Granger pulled up to the Greenville Imports parking lot, Buford walked "across the street to Huddle House or to a store but he never came back."

[5] The record indicates the tow truck belonged to Granger.

[6] Granger testified he saw Bates get out of the vehicle with the same yellow envelope.

personnel] got [Bates] off the ground, [he] picked the [yellow] envelope up." On cross-examination, Granger testified he "wasn't paying attention" when the shooting happened and "still [didn't] know exactly what happened." He further testified he never gave the envelope to the police officers. When the defense asked Granger if he removed a gun from the crime scene, he responded, "What I'm gonna remove a gun for. He ain't have no gun. . . . If he had had it I believe he would have defended himself."

¶9.     Bates next testified for the State. He testified that he visited Greenville Imports twice on the date of the incident. The first visit was "around 9:00 a.m." During that visit, Bates stated he arrived at Greenville Imports in his Mini Cooper, while Granger and "whoever he had with him" drove separately in Granger's tow truck. Bates then went into Greenville Imports to "make sure John didn't look out the window" while Granger and "someone else" got the truck. Around thirty minutes after Bates had repossessed the truck, he received a call from Scates. Bates stated that Scates told him he "[needed] the truck back." Bates, who was then driving to Jackson, agreed to return the truck as soon as Bates came back into town. Later that afternoon, Bates's car "broke down," and Granger assisted him. They then drove straight to Greenville Imports (per the discussion between Bates and Scates). During that second visit, Bates testified, he walked into Scates's office and told him, "All right . . . let's go get your truck." When Bates and Scates got to the door, Bates told Scates, "[H]ey, you're gonna give me a little extra juice with this." Scates responded that he did not have any extra "juice." As the two faced the car lot, Scates asked Bates "[W]here's my truck at." Bates told Scates, "just told you we got to go get it." Scates then said, "I want my godd[***] truck." In response, Bates said, "[I]f you got my money put it on the back of the Mustang." Bates

5

testified that he turned around, and "the next thing [he] knew [he] just heard the shot and fell." He then heard a second shot, which grazed his hand. Bates testified he did not have any weapons on him. Bates did not recall seeing a manilla envelope that day or at any point thereafter, but when he was in the hospital, he found out that "they got an envelope off the ground that had blood and stuff on it." He further testified that when he was lying on the ground, he told Scates, "[W]hy you shot me . . . you was fixing to get your truck back . . . now you ain't gonna never get it back."

¶10.    During Bates's cross-examination, Bates stated he never threatened Scates and specifically stated, "Why would I? . . . I would be a fool to." Later on during the cross-examination, the following exchange occurred between Scates's counsel and Bates:

> Q:    Mr. Bates, do you remember coming to my office in the later part of October and telling me that all of this was a mistake?
> A:    You're asking me to answer?
> Q:    Yes.
> A:    Yes, because you offered me $35,000.
> Q:    Did what?
> A:    You offered me $35,000.
> Q:    I offered you $35,000?
> A:    Yes, . . .
> Q:    You are absolutely out of your mind.

As a result of this statement, a bench conference ensued, and defense counsel moved for a mistrial on the ground that Bates's comment strongly prejudiced the defense. The following exchange occurred:

> DEFENSE COUNSEL:    I'm gonna ask that a mistrial be declared.
> STATE COUNSEL 1:    We can strike the testimony.
> DEFENSE COUNSEL:    It's prejudicial. I'm gonna ask that a mistrial be declared.
> BY THE COURT:    I'm not gonna declare a mistrial.

| | |
|---|---|
| DEFENSE COUNSEL: | Well, I got to do something to cure this problem because he is lying his butt off. |
| BY THE COURT: | I mean, that's up to the jury to see whether he - - |
| DEFENSE COUNSEL: | I haven't offered him a penny . . . it's highly prejudicial. |
| BY THE COURT: | Well, it is but - - |
| DEFENSE COUNSEL: | It frankly pisses me off quite frankly. |
| STATE COUNSEL 1: | I appreciate that, Wayne, but I don't know as far as where we're at now and legally regarding this trial I don't know that there - - |
| DEFENSE COUNSEL: | Legally, this jury has heard it. Legally, this jury if they believe that they're not gonna believe another word I say, and it's prejudicial and I move for a mistrial. |
| BY THE COURT: | I'm going to overrule the motion for a mistrial. |
| STATE COUNSEL 2: | I guess the Court can look into doing a limiting instruction in regards to any comments made. . . . |
| BY THE COURT: | I know you're upset but let's keep the voice down. I don't know of any way that you can rehab this at this point. I would say I'm not inclined to grant a mistrial. I don't know what to tell you to do about concluding this cross-examination of this witness. Personally, I would not touch this. I would try to figure out some kind of limiting instruction, but that's what I would do. If you want to ask him any follow up you can. You can ask him if he's got any proof of this or anything like that. |
| DEFENSE COUNSEL: | Well, I mean, if I just leave it alone, what impression is that gonna leave the jury. . . . It's a credibility issue now. They're not gonna believe what I say. . . . There's got to be some way to tell the jury to disregard it or something. |
| BY THE COURT: | Why don't you research that tonight. Let's go ahead and finish this cross-examination. If you can show me a case, I would be glad to give a limiting instruction to the Jury. |
| DEFENSE COUNSEL: | And I guess the limiting instruction would -- |
| STATE COUNSEL 1: | Let's cross that bridge when we get there. |
| STATE COUNSEL 2: | Okay. |
| BY THE COURT: | I don't have an idea what it would be right now. Let's just go ahead and conclude this cross-examination and move on. |

DEFENSE COUNSEL:     Could I have just a minute?
BY THE COURT:          Very well.

The bench conference concluded, and the court recessed. When the jury returned to the courtroom, defense counsel stated he had no further questions for Bates. The State conducted a redirect examination but never addressed Bates's testimony about the alleged offer of $35,000. Scates never explicitly asked for any type of limiting instruction again.

¶11. The State next called Dr. Matthew Kutcher, who is employed as a trauma surgeon at the University of Mississippi Medical Center in Jackson. Dr. Kutcher treated Bates for a "gunshot wound to the right lower back." Dr. Kutcher explained that Bates had "several fractures of the sacrum." Dr. Kutcher further testified Bates had a laceration of the hand. Dr. Kutcher explained that Bates did not require surgery but that he remained in the hospital for several days.

¶12. The State next called Jacob Burchfield, an employee with the Mississippi Crime Laboratory. Burchfield was tendered as an expert in trace evidence analysis. Burchfield performed the analysis on the gunshot residue kit that was collected from Scates. Burchfield testified that the gunshot-residue test was positive on Scates's right hand.

¶13. On the second day of trial, the State called Lieutenant Timothy Elzy, who was employed with the Greenville Police Department as a "patrol commander supervisor." He testified that on the day of the shooting, he was dispatched to Greenville Imports. Lieutenant Elzy testified that once he arrived on the scene, he made contact with Bates, who indicated he had been shot. Officer Elzy also noticed a bullet fragment and shell casing near Bates's body.

8

¶14. The State next called Steven O'Neal, who was also employed with the Greenville Police Department. Officer O'Neal testified that on the day of the shooting, he too was dispatched to Greenville Imports. Once he arrived on scene, he began taking photos of the crime scene and collecting evidence. He collected a bag of "two spent .45 shell casings," which were admitted into evidence. Additionally, the photos he had taken of the crime scene were admitted into evidence. While on the scene, Officer O'Neal also observed the firearm that Officer Norris secured from Scates. That firearm was admitted into evidence. Officer O'Neal testified he was given no indication that any other firearm existed other than the one that was collected from the scene. Further, he testified there was no indication that what had occurred had anything to do with a dispute over an envelope.

¶15. The State then rested, and the defense moved for a directed verdict, which the court denied. Following a recess, a meeting occurred with the trial judge in chambers during which Scates indicated that he wanted to testify in his defense. The jury then returned, and the defense called Scates as its sole witness.

¶16. Scates testified that on the date of the incident, he discovered his truck was missing from the lot. Scates called Bates and told him he wanted his truck back. Scates told him he had the money and would pay him as long as Bates brought him the title to the truck. Bates agreed. That evening, while Scates was sitting in his office, he saw Bates enter the Greenville Imports lot in a tow truck without the truck. Bates walked into Scates's office. Scates then asked Bates where the truck was, and Bates responded that he needed an additional $1,200 as "juice." Scates told him he did not have $1,200, and Bates then "got a little cocky and arrogant" and said he had the truck but he wanted the money.

9

¶17. Scates next testified that he and Bates started to walk outside, and Scates noticed that Bates had a manilla envelope in his hand. Bates then pointed to a Mustang and said, "Put $1,200 here and we'll go get your truck." Scates told Bates, "I'm not paying you $1,200. I'll let the police handle it tomorrow." Scates testified that Bates then became "irate" and started screaming and threatened to "end [Scates's] f***** life." Scates testified that he asked Bates "what the f*** was he talking about" and then saw Bates "turn sideways" as if "reaching for his gun" and "about to make good on his threat." Scates stated he was "scared" and "pulled [his] weapon and . . . shot twice in [Bates's] general direction while [Scates] was moving farther to try to get behind the car." Scates testified he then saw Granger, who had been standing by his tow truck, running up to Bates, who had fallen on the ground. Granger called 911. Scates testified that he witnessed Granger "take [Bates's] weapon and envelope and leave." Scates stated Granger returned to the scene after the police officers arrived, but he did not have the gun or the envelope with him. Scates further testified that later on, he checked the title on the truck, and "the truck [came] back as being reported stolen," which Scates believed was the reason Bates could not produce a clear title to the truck.

¶18. On cross-examination, Scates admitted that he did not tell Officer O'Neal about Granger leaving the scene with Bates's weapon, but he stated that he did tell Officer Norris and assumed that Officer Norris would have communicated it to Officer O'Neal. After jury instructions and closing arguments, the jury convicted Scates of aggravated assault with the firearm enhancement. The transcript indicates the following occurred:

BY THE COURT: May I have the verdict, please. "We, the jury, find the

defendant guilty of aggravated assault. We, the jury,
find the defendant guilty of firearm enhancement." I
will poll the jury.

(EACH JUROR, UPON BEING ASKED BY THE COURT, "IS
THIS YOUR VERDICT?" ANSWERED IN THE AFFIRMATIVE.)

BY THE COURT: Thank you. So the verdict was unanimous.

¶19. Shortly after the jury's verdict, on June 7, 2021, Scates filed a motion for an in camera examination of a juror and for a mistrial. On October 11, 2021, a hearing was held in chambers as to this motion. The relevant testimony from this hearing will be discussed in the analysis below. Scates's sentencing hearing took place immediately thereafter. Scates was sentenced to serve twenty years in the MDOC's custody for the aggravated assault conviction and an additional five years for the firearm enhancement, which was ordered to run consecutively to the twenty-year term. Following his sentencing, on October 14, 2021, Scates filed a "Motion to Vacate Judgment and to Grant a New Trial." The court did not prepare a written order denying Scates's post-trial motion until August 15, 2022. Scates filed his notice of appeal on August 22, 2022.[7]

---

[7] Rule 25.3 of the Mississippi Rules of Criminal Procedure mandates that a motion for a new trial is deemed denied by operation of law thirty days after its filing if the trial court has not yet denied the motion or entered an order of continuance. No order of continuance was entered as for Scates's motion. Therefore, Scates's motion was denied thirty days from October 14, 2021, and his thirty-day period to file his notice of appeal began to run at that time. MRCrP 25.3; *see* M.R.A.P. 4(e). Scates did not file his notice of appeal, however, until August 22, 2022, which was nine months late. This court must dismiss this appeal unless the rules are suspended to allow for an out-of-time appeal. *See Fair v. State*, 571 So. 2d 965, 966 (Miss. 1990) (holding"[w]e may suspend [the Rules of Appellate Procedure] 'when justice demands' to allow an out-of-time appeal in criminal cases"). After full consideration, pursuant to the Mississippi Rule of Appellate Procedure 2(c), we suspend the rule and proceed on the merits.

¶20. On appeal, Scates argues that (1) the trial court erred by denying his motion for a mistrial after Bates made a statement that Scates's defense counsel bribed him, (2) the trial court erred by not granting a new trial due to the intimidation of a juror during jury deliberations, and (3) the trial court erred by not granting a new trial because the jury's verdict was against the overwhelming weight of the evidence.

## ANALYSIS

I. **Whether the trial court erred by denying Scates's motion for a mistrial after Bates made a statement that defense counsel had offered to pay Bates $35,000.**

¶21. Scates claims that the trial court erred by denying his motion for mistrial made after Bates testified that defense counsel offered to pay him $35,000. A claim of prejudicial testimony occurred as follows when Scates' attorney questioned Bates:

Q: Mr. Bates, do you remember coming to my office in the later part of October and telling me that all of this was a mistake?
A: You're asking me to answer?
Q: Yes.
A: Yes, because you offered me $35,000.
Q: Did what?
A: You offered me $35,000.
Q: I offered you $35,000?
A: Yes, . . . .
Q: You are absolutely out of your mind.

¶22. After that exchange, Scates's attorney asked for a mistrial. Following a lengthy on-the-record discussion outside the presence of the jury, the trial court denied the motion for a mistrial, and a short recess was allowed. When the judge returned to the courtroom, the judge asked Scates's attorney if he had any more questions for Bates, and Scates's attorney replied, "[N]o, your honor." No further mention of the alleged $35,000 offer was ever made

12

to the jury by any other witness. However, in closing arguments, Scates's attorney made the following statements:

> And folks I'm telling you, I've done this for 43 years. I have never called anybody a liar, but that man is a liar. He told you yesterday that I offered him $35,000 to drop this charge. That is absolutely ridiculous. And you notice after he made that statement I didn't ask him any more questions, because once he told that lie I couldn't believe nothing else the man said, couldn't believe nothing he had said. For him to sit here and want you to believe his story after telling that is just unconscionable. If he'll lie about that he'll lie about anything, and I'll say it to his face he's a liar.

¶23. This Court "employs an abuse-of-discretion standard of review to determine whether a trial judge erred in denying a request for a mistrial." *Sharkey v. State*, 265 So. 3d 151, 155 (¶14) (Miss. 2019) (citing *Pitchford v. State*, 930 So. 2d 383, 386 (Miss. 2006)).

¶24. The Mississippi Rules of Criminal Procedure make it clear that a mistrial *may* be declared if during the trial, either inside or outside the courtroom, misconduct by a party occurs resulting in substantial and irreparable prejudice to the movant's case. *Scott v. State*, 347 So. 3d 1173, 1175 (¶11) (Miss. 2022) (citing MRCrP 23.5). In such instances, the court is granted broad discretion to decide whether a mistrial should be granted. *Parks v. State*, 930 So. 2d 383, 386 (¶8) (Miss. 2006)); *see Harrell v. State*, 947 So. 2d 309, 316 (¶23) (Miss. 2007) (On review, "the trial judge is permitted considerable discretion in determining whether a mistrial is warranted because the judge is best positioned to measure the prejudicial effect." (quoting *Parks*, 930 So. 2d at 386 (¶8))); *see also Roundtree v. State*, 568 So. 2d 1173, 1178 (Miss. 1990) (citing *Alexander v. State*, 520 So. 2d 127, 131 (Miss.1988) (affirming a trial court's denial of a motion for mistrial on the grounds that "[c]ase law unequivocally holds that the trial judge is in the best position for determining the prejudicial

effect of an objectionable remark"); *Reynolds v. State*, 585 So. 2d 753, 755 (Miss. 1991) (affirming a trial court's denial of mistrial on the grounds that the trial judge "is in the best position to determine if a remark is truly prejudicial [and] is given considerable discretion to determine whether a remark creates irreparable prejudice necessitating a mistrial").

¶25.    In *Trest v. State*, No. 2021-KA-00968-COA, 2023 WL 3593402, at *2 (¶9) (Miss. Ct. App. May 23, 2023), *petition for cert. filed* (Miss. Oct. 10, 2023),[8] a pretrial motion in limine was filed to limit a victim's testimony to her personal experiences of Trest's alleged sexual abuse and to prevent her from testifying about Trest's alleged sexual abuse of anyone else. During her testimony, the victim testified that Trest abused "us." *Id.*  Trest alleged she violated the court's order. *Id.* The trial judge immediately stopped the testimony, removed the jury, and admonished the victim to tailor her testimony only to her own personal experience. *Id.*  Later in her testimony, the victim mistakenly said "us" a second time. *Id.* A limiting instruction was immediately given. *Id.*  Then, Trest moved for a mistrial. *Id.* The circuit court denied the motion on the grounds that the victim did not intentionally violate the order and that there was a contemporaneous limiting instruction given. *Id.* at *5 (¶25). Trest then appealed. *Id.* at *2 (¶9).

¶26.    On appeal, this Court found no abuse of discretion. *Id.* at *5 (¶25). We based our decision on the fact that "the trial judge sits in the best position to determine if an improper comment has a prejudicial effect." *Id.* (citing *Tate v. State*, 20 So. 3d 623, 642 (¶48) (Miss. 2009)). Additionally, we discussed Trest's reliance on another case, *Snelson v. State*, 704

----

[8]  This opinion is not yet legal precedent.

So. 2d 452, 457 (¶30) (Miss. 1997), and distinguished the facts of that case. *Trest*, 2023 WL 3593402, at *6 (¶¶27-29). The Court held that "[u]nlike the State in *Snelson*, the State in this case did not elicit the improper testimony from M.K.B." *Id.* (¶28). Additionally, we held that the improper testimony did not rise to the level as did the improper testimonial evidence in *Snelson*, where the testimony was an alleged quote from the defendant that he had killed other people. *Id.* (¶29). On these grounds, we found no abuse of discretion in the trial court's decision to not order a mistrial. *Id.*

¶27. This Court was presented with a similar question in *Bankhead v. State*, 299 So. 3d 853 (Miss. Ct. App. 2020). In that case, Bankhead was charged with capital murder. *Id.* at 854 (¶1). At trial, while the State was playing a video of Bankhead's interview with police, counsel for the State attempted to "skip over" an inadmissible remark that Bankhead was a "convicted felon," but in doing so, the jury accidentally heard the remark. *Id.* at 857 (¶14). Defense counsel moved for a mistrial. *Id.* The trial court carefully considered the issue and ultimately decided that "because there was no deliberate misconduct by the State and the court's initial instructions to the jury had already said to disregard any evidence stricken from the record," the trial court would "deny the motion for a mistrial, give a curative instruction, and poll the jurors on their ability to follow the instruction and disregard the remark." *Id.* at (¶12). Bankhead was convicted and sentenced to life imprisonment without eligibility for parole. *Id.* On appeal, he claimed he was entitled to a mistrial because his right to a fair trial was violated by the remark. *Id.* at (¶13). Ultimately, this Court held that there was no abuse of the trial court's discretion because there was no prosecutorial misconduct, the remark had been properly redacted from the transcript given to the jury, and the jury was instructed to

15

disregard the statement and polled. *Id.* at 858-60 (¶¶22-25). Accordingly, this Court affirmed Bankhead's conviction. *Id.* at 860 (¶25).

¶28. In *Morgan v. State*, 117 So. 3d 619, 620 (¶1) (Miss. 2013), the Supreme Court again addressed an alleged error in denying a mistrial. In that case, Morgan appealed his murder and manslaughter convictions. *Id.* At his trial, a witness testified that she saw the victim getting involved in a fight against "[a]ll the Ghost Boys." *Id.* at 621 (¶5). She then testified to seeing Morgan fire the gun that killed the victim. *Id.* Defense counsel objected to the admissibility of gang-related evidence, and a bench conference ensued. *Id.* at (¶6). Defense counsel moved for a mistrial, which the trial judge denied, finding that the witness's "statement was not an intentional introduction of evidence of gang involvement by the State." *Id.* On appeal, Morgan argued that the trial court abused its discretion by denying his motion for a mistrial because the witness's testimony "left the jury with the inference that the Ghost Boys were dressed in dark clothes[,] and Moran was a member of that gang." *Id.* at 624 (¶19). The Supreme Court disagreed and found it significant that the witness "blurted out the statement in response to general questioning regarding her observations of the fight." *Id.* at 625 (¶21). The Supreme Court further emphasized the considerable discretion of the trial judge in determining the prejudicial effect. *Id.* at (¶23). The Supreme Court held, "[H]ere, the trial judge found that drawing attention to [the witness's] passing reference to [the fight] with "the Ghost Boys," by instructing the jury to disregard it, could have been more prejudicial than the statement itself had been—and Morgan's counsel agreed." *Id.* On these grounds, the Supreme Court found no abuse of discretion in the trial court's denial of Morgan's motion for a mistrial. *Id.* at (¶24).

16

¶29. Scates relies on *Vickery v. State*, 535 So. 2d 1371, 1380 (Miss. 1988). In *Vickery*, the defendant was charged with possession of more than one kilogram of marijuana. *Id.* at 1373. At trial, the State's witness stated, "It's been my experience that people involved in the drug business try very hard and they're very good at covering their tracks. And I'm sure that this defendant had keys to Apartment 119." *Id.* at 1379. Defense counsel objected to this statement, which the judge sustained, and requested an admonition to the jury to "ignore the speculation," which the trial judge gave. *Id.* at 1380. On appeal, the defendant claimed the trial court erred in allowing the State's witness to make the prejudicial comments over the objections of defense counsel. *Id.* The Supreme Court reversed and rendered in favor of the defendant on the ground that the trial court's instructions to the jury "could not cure the prejudicial effect the comments would have on the jury." *Id*.

¶30. The facts in *Vickery* are quite different from the facts here. *Vickery* concerned the adequacy of the limiting jury instruction that was actually given. Here, no limiting instruction was ever given because Scates never requested one. Scates asks this Court to hold the trial court in error for not giving a limiting instruction when he never asked for one or provided a proposed instruction to the trial court. The holding in *Vickery* does not apply to the facts before us.[9]

¶31. Like in *Trest and Bankead*, the State did not elicit the prejudicial statement from Bates, nor was there any prosecutorial misconduct. Rather, it was defense counsel who was

---

[9] Scates never requested a limiting instruction. The trial court does not have the burden to issue limiting instructions sua sponte. *See Brown v. State*, 890 So. 2d 901, 913 (¶36) (Miss. 2004).

cross-examining Bates. In fact, defense counsel invited the statement by asking Bates, "[D]o you remember coming to my office in the later part of October and telling me that all of this was a mistake?" Bates responded, "You're asking me to answer?" Defense counsel responded, "[Y]es." Like in *Morgan*, Bates blurted out the statement in response to general questioning from defense counsel. Furthermore, it is well established that "a defendant cannot complain on appeal of alleged errors invited or induced by himself." *Thomas v. State*, 249 So. 3d 331, 347 (¶55) (Miss. 2018) (citing *Galloway v. State*, 122 So. 3d 614, 645 (Miss. 2013); *O'Connor v. State*, 120 So. 3d 390, 397 (¶17) (Miss. 2013); *Singleton v. State*, 518 So. 2d 653, 655 (Miss. 1988)). The purpose of this rule is to "bind trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their client." *State v. Hargrove*, 293 P.3d 787, 795 (Kan. Ct. App. 2013). The rule "also defeats the disreputable strategy aimed at requesting that a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse judgment." *Id*.

¶32. Further, we acknowledge that the trial judge was in the best position to determine the prejudicial effect of the fleeting statement and whether a mistrial should have been granted.[10] *See Roundtree v. State*, 568 So. 2d 1173, 1178 (Miss. 1990). Exercising this discretion here, the trial judge denied defense counsel's motion for a mistrial. The statement made was fleeting, uttered one time, and vehemently denied by defense counsel in front of the jury.

---

[10] Scates also contends that the trial judge should have declared a mistrial sua sponte. This argument is without merit because defense counsel moved for a mistrial, eliminating the need for the court to act on its own accord.

The statement, after being uttered one time by the witness, was not mentioned again until defense counsel brought it up in closing argument. The making of the statement certainly appears to have offered the defense a trial strategy on why the jury should not believe Bates, the victim of the shooting, and should believe Scates, who claimed he shot Bates in self-defense. In closing, defense counsel highlighted he would not believe Bates "because once he told that lie I couldn't believe nothing else the man said." Under these circumstances, we cannot say that the trial court abused its discretion in denying Scates's motion for a mistrial.

**II.      Whether the trial court erred by denying defense counsel's motion for a new trial due to alleged intimidation of a juror by her fellow jurors.**

¶33.    On June 7, 2021, Scates made a motion for an in camera examination of a juror ("the Juror") and for a mistrial.[11] In support of this motion, Scates attached an affidavit of a woman named Pamela Baker,[12] who indicated that the Juror went to her home on May 26, 2021, and was "very emotional and crying trying to get the words out that in her heart, John was innocent." The affidavit continued that the Juror's first vote was "not guilty," but after three female jurors started cussing at her and threatening her, the Juror "just wanted out" and changed her vote to guilty.

¶34.    On October 11, 2021, a proceeding was held in chambers with a court reporter

---

[11] On October 14, 2021, Scates filed a "Motion to Vacate Judgment and to Grant a New Trial."

[12] Pamela Baker is a personal friend of the Juror.  Baker was not at all involved in the events at issue here.

19

present, and a record was produced. The State objected to the Juror being called as a witness pursuant to Mississippi Rule of Evidence 606(b). The court appeared to agreed with the State but nevertheless allowed the Juror to be called. At that hearing, the Juror testified that she originally did not feel that Scates was guilty. She testified that during jury deliberations, "a couple of the young ladies" who were on the jury with her "had some type of attitude." Further, she testified that the jurors said to her, "[F]*** this, do not have us sitting in here being in here any longer; girl, please, he's guilty." When she asked what was going to happen to her if she did not change her vote to guilty, she was told, "[I]t's a whole lot of shit may happen to you." She stated that because of this coercion, she said in her mind, "[F]orget it, he's guilty, but within my heart and what I heard of everything, the situation, I felt that he was not guilty." She then changed her vote from not guilty to guilty.[13] Following the Juror's testimony, without ruling from the bench, the court immediately began the sentencing hearing.

¶35. The court denied Scates's motion to vacate the judgment or to grant a new trial on August 15, 2022. The court entered a general denial order and did not expressly address the juror-intimidation issue. The court never made any factual determinations of whether any outside influence was exerted or whether the alleged pressure on the Juror occurred only during deliberations. However, before the Juror gave her testimony, the trial judge stated on the record:

> It is my understanding, this has come up one time in my entire tenure, and my

---

[13] She further testified that the same two female jurors who coerced her during deliberations rode by her house several times after the verdict, and she was intimidated.

20

understanding is that you can't go behind the jury verdict, and that was the result I reached in the last time this came up which was at least 10 years ago, probably more than that. I will allow you to put your proof on.

¶36. This Court will not reverse a trial court's ruling on a motion for a new trial unless the trial court abuses its discretion. *Burnham v. Tabb*, 508 So. 2d 1072, 1075 (Miss.1987); *Davis v. Singing River Elec. Power Ass'n*, 501 So. 2d 1128, 1129 (Miss.1987); *Shelton v. Puckett*, 483 So. 2d 354, 355 (Miss.1986). "Where such extra-record facts affect an issue of importance in the case and are qualitatively different from the evidence properly before the jury, a new trial may be ordered." *Salter v. Watkins*, 513 So. 2d 569, 571 (Miss. 1987).

¶37. Mississippi Rule of Evidence 606(b)(1) states:

(b) During an Inquiry into the Validity of a Verdict or Indictment.

(1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify **about any statement made or incident that occurred during the jury's deliberations;** the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

(Emphasis added). There are two broad instances where a court can investigate juror deliberations. Mississippi Rules of Evidence 606(b)(2) explains when a juror may testify and what kind of testimony is allowed:

(2) *Exceptions*. A juror may testify about whether:

(A) extraneous **prejudicial information was improperly brought** to the jury's attention; or
(B) an **outside influence** was improperly brought to bear on any juror.

(Emphasis added); *see also Rutland v. State*, 60 So. 3d 137, 142 (¶20) (Miss. 2011).

21

¶38.   The spirit behind Rule 606(b) was born out of years of cases that preceded the adoption of the Mississippi Rules of Evidence.  In *Sprinkle v. State*, 137 Miss. 731, 742, 102 So. 844, 845 (1925), two jurors took newspaper articles into the deliberation room, which made all the jurors privy to information not introduced at trial. The trial court allowed testimony of the jurors as to the two jurors's misconduct but did not investigate the misconduct further.  On appeal, the Supreme Court stated, "[J]urors **will not** be permitted on a motion for a new trial to **give evidence as to what influenced their verdict**." *Id.* at 846 (emphasis added).

¶39.   In another pre-rules case, *Crawley v. Illinois Central Railroad Co.*, 248 So. 2d 774, 774 (Miss. 1971), the Supreme Court was faced with the issue as to whether two jurors' visit to the scene of the accident was improper conduct.  The Supreme Court ultimately held,

> We are of the firm opinion that the **verdict of a jury should not be subject to impeachment by testimony of the jurors**; nevertheless, where jurors disobey the orders of the court to the extent of visiting the scene involved in a case, when the scene is a material factor in issue, as in this case, for the purpose of obtaining additional evidence, such conduct of jurors must be considered to be improper.

*Id.* at 777 (emphasis added). In reaching this conclusion, the Supreme Court cited *Ratcliff v. Nail*, 231 So. 2d 798, 800 (Miss. 1970), for the principle that "it has long been the law of this state that jurors cannot testify to impeach a verdict rendered by them." *Crawley*, 248 So. 2d at 775.

¶40.   Since the adoption of the Mississippi Rules of Evidence, courts have had occasions to take up the issue again.  In *Schmiz  v. Illinois Central Gulf Railroad Co.*, 546 So. 2d 693, 695 (Miss. 1989), the Supreme Court addressed an issue involving two jurors who visited the

22

railroad crossing at issue in their case and informed the other jurors of their visit, as well as the impression they gained as a result. The Supreme Court cited *Sprinkle* and *Crawley*, stating that jurors "will not be heard to give evidence as to their own misconduct, but they will be heard to give evidence as to misconduct of others which is calculated to have a bearing on their verdict." *Id.* at 697 (emphasis omitted) (quoting *Crawley*, 248 So. 2d at 775).

¶41. The Supreme Court addressed this matter again in *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 414 (1993). Following the reading of a jury verdict, a juror approached an attorney for the Gladney Estate and told him that one of the jurors had visited the scene of the accident, and another juror had "run an experiment." *Id*. at 410. Gladney then moved for a new trial and in support of this motion argued to allow the sworn affidavits of two of the jurors as to the alleged misconduct. *Id.* The trial court denied the motion and refused to consider the evidence from the jurors because "the defendants have simply not shown as required by Rule 606(b) that, number one, the jury was improperly exposed to extraneous prejudicial information, or number two, whether improper outside influences were exerted on a juror." *Id.* at 415. The Supreme Court agreed. Specifically, the Supreme Court found that to allow the affidavits "would be in serious conflict with our own precedent. It would also be in conflict with the explicit language of M.R.E. 606(b), which states that a juror may not use an affidavit or evidence of any statement by him concerning a matter he is precluded from testifying on for any purpose outlined within the rule." *Id*. Accordingly, the Supreme Court upheld the trial court's decision. Here, the trial court allowed the juror to testify about matters that occurred during deliberations without explaining or distinguishing the *Gladney* precedent prohibiting such testimony.

¶42.    In *Payton v. State*, 897 So. 2d 921, 929 (¶134) (Miss. 2003), the Supreme Court was presented with this question yet again.  In *Payton*, the defendant was convicted of armed robbery and arson. *Id.* at 930 (¶1). During the hearing on Payton's motion for a new trial, Payton attempted to introduce affidavits and testimony of two jurors.  *Id.* at 952 (¶123).  He argued the testimony would reveal that the jurors knew a particular witness would not lie and that they failed to admit to knowing the witness during voir dire.  *Id.*  The State contended the testimony related to individual juror misconduct and not to any outside influences. *Id.* at (¶124).  The Supreme Court agreed with this contention. In reaching its holding, the Supreme Court stated, "Jurors generally may not impeach their own verdict by testifying about motives or influences affecting deliberations. *Id.* However, jurors may testify about misconduct in their presence or about outside influences on the jury panel."  *Id.* at 954 (¶133).   The Supreme Court further held, "M.R.E. 606(b) prevents a juror's affidavit or any evidence of a statement made by a juror concerning the jury's deliberations from being received into evidence."  *Id.* (citing *APAC-Miss. Inc. v. Goodman*, 803 So. 2d 1177, 1186 (Miss. 2002)). The Supreme Court then cited *Gladney* for the principle that "in the course of post-trial hearings, juror testimony is only admissible as to objective facts bearing on extraneous influences on the deliberation process." *Id.* (citing *Gladney*, 625 So. 2d at 419). Furthermore, the Supreme Court found that "[i]nformation [that comes] from the jurors' own knowledge of the facts and witnesses . . . in no way relates to extraneous information supplied from outside the jury room."  *Payton*, 897 So. 2d at 954 (¶134).   The Supreme Court therefore upheld the trial court's decision.

¶43.    Finally, this issue was revisited in *Roach v. State,* 116 So. 3d 126, 131 (¶13) (Miss.

2013). In *Roach*, the defendant was convicted of possession of cocaine and possession of hydromorphone. *Id*. at 128 (¶2). In his motion for post-conviction relief, Roach claimed he was entitled to a new trial because a juror had been given extraneous information by law enforcement during his trial. *Id.* (¶3). After a hearing, the trial court denied this motion on the grounds that he had given at least five different versions of what happened. *Id.* at 130 (¶9). Roach appealed. *Id.* (¶10). This Court agreed with the trial court's reasoning and affirmed. *Id.* Roach then filed a petition for writ of certiorari, which the Supreme Court granted. *Id.* (¶12). The Supreme Court first defined the process for trial judges to employ when allegations of juror misconduct or extraneous information arise. *Id.* at 132 (¶17) (citing *Gladney*, 625 So. 2d at 418). First, the court must determine whether an investigation is warranted. *Id.* "An investigation is warranted if the trial judge finds that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information. If the trial court determines there is no threshold showing of external influences, the inquiry stops there."[14] *Id.* (internal quotation marks and citation omitted). The Supreme Court then took up the question of whether there was good cause to believe the jury received extraneous information or was improperly influenced. *Id.* The Supreme Court noted, "In any trial there is initially a presumption of jury impartiality." *Id.* at 133 (¶21) (internal quotation marks omitted) (quoting *Carr v. State*, 873 So. 2d 991, 1005 (¶38) (Miss. 2004)). Ultimately,

_____

[14] Here, the threshold inquiry as to whether there was an extraneous or outside influence is dispositive. However, the second determination is "whether the communication was made and the nature of the communication." *Roach*, 116 So. 3d at 132 (¶17). Finally, if the investigation reveals that the communication was made, the court must determine whether it was reasonably possible that the communication altered the verdict. *Id.*

the Supreme Court held that "under the facts presented, and giving deference to the trial judge's determination of the credibility of witnesses, we cannot say that the trial judge erred in concluding that Roach failed to prove that there was good cause to believe the jury had been exposed to extraneous prejudicial information." *Id.* at 134 (¶24). Accordingly, the Supreme Court affirmed both the trial court's denial of Roach's motion for post-conviction relief and this Court's decision affirming the denial. *Id.* at 135 (¶30).

¶44. Pressure to reach a verdict by other jurors does not constitute improper external influence sufficient for an investigation into juror misconduct. In *Hayes v. Entergy Mississippi Inc.*, 871 So. 2d 743, 747 (¶12) (Miss. 2004), after the reading of the verdict in a wrongful death action, the jury was polled, revealing a verdict of 10-2 in favor of the defendant. After the jury was dismissed, several jurors attempted to speak to counsel for the plaintiff. *Id.* Plaintiff's counsel then directed the three jurors to the court and requested that the court conduct a hearing with regard to the purpose behind the jurors approaching him. *Id*. A hearing was conducted and three jurors testified that they felt pressured into making a decision by other members of the jury who had grown impatient with the deliberation process. *Id*. The trial court did not conduct further investigation of the three jurors. *Id*. Hayes appealed to the Supreme Court arguing that a post-trial investigation was warranted to determine whether there was jury misconduct. *Id.* at (¶13). The Supreme Court noted that the three jurors indicated that they had voted for the verdict when polled. *Id*. at 747-48 (¶14). The court ultimately held "it is clear there were no external influences upon the jury" to warrant any investigation. *Id*. at 748 (¶14). The Supreme Court further held, "Each juror was given the opportunity, when polled, to express any dissatisfaction with the verdict and the

26

opportunity to vote without any jury deliberation room pressure. Therefore, the court was correct in refusing to allow further investigation of alleged jury misconduct." *Id*.

¶45. Here, the threshold showing of external influences is absent at the outset as there was no *external* influence at all. Scates does not even allege "improper outside influence." Rather he alleges the improper influence occurred during deliberations by other jurors. Like the defendant in *Hayes*, Scates alleges that the juror felt pressured into reaching a verdict by her fellow jurors. However, when the jury was polled in open court following the verdict, the juror affirmatively stated she agreed with the verdict. As in *Hayes*, the juror had an opportunity to express her dissatisfaction with the verdict and the opportunity to address her concerns with the court without the pressure of the other jurors. Further, Scates's reliance on the juror's testimony was misplaced. Juror testimony is not competent when that testimony pertains to "any statement made or incident that occurred during the jury's deliberations[.]" MRE 606(b)(1); *see supra* ¶¶30-36. Accordingly, we find no abuse of discretion in the trial court denying defense counsel's motion for a new trial.

### III. Whether the jury's verdict was against the overwhelming weight of the evidence.

¶46. Scates also asserts that in the alternative, he is entitled to a new trial because the jury's verdict was against the overwhelming weight of the evidence. He asserts that "the testimony of Bates is untrue at best and constitutes perjury at worst." Scates relies on the conflict between his and Bates's testimony and points out that "[Bates's] testimony was refuted by two police officers who testified that no one was within the crime scene area and that Granger was not present when the ambulance arrived."

27

¶47.   We review the denial of a post-trial motion seeking a new trial under an abuse-of-discretion standard. *Husband v. State*, 23 So. 3d 550, 552 (¶9) (Miss. Ct. App. 2009) (citing *Dilworth v. State*, 909 So. 2d 731, 736 (¶17) (Miss. 2005)). This Court will not grant a new trial unless the verdict it is so contrary to the overwhelming weight of the evidence that allowing it to stand would sanction an unconscionable injustice. *McLendon v. State*, 945 So. 2d 372, 385 (¶40) (Miss. 2006) (citing *Groseclose v. State*, 440 So. 2d 297, 300 (Miss. 1983)). The evidence is reviewed in a light most favorable to the verdict. *Wilson v. State*, 276 So. 3d 1241, 1262 (¶57) (Miss. Ct. App. 2018). Issues of weight and credibility of witness testimony are within the sole province of the jury. *Thompson v. State*, 338 So. 3d 730, 736 (¶28) (Miss. Ct. App. 2022).

¶48.   Scates admitted that he shot Bates. The sole question of fact at trial was whether Scates did so in self-defense. Bates testified as to his version of the incident. Scates testified as to his version of the incident.   Granger testified what he observed about the incident. Whether the shooting was self-defense was a factual question for the jury.   "The issue of justifiable self-defense presents a question of the weight and credibility of the evidence rather than sufficiency and is to be decided by the jury." *Swanagan v. State*, 229 So. 3d 698, 703 (¶22) (Miss. 2017) (internal quotation marks omitted) (quoting *Wade v. State*, 748 So. 2d 771, 774 (Miss. 1999)). The opposing testimonies of Scates and the State's witnesses were "fully and fairly presented to a properly instructed trier of fact." *Ambrose v. State*, 133 So. 3d 786, 792 (¶20) (Miss. 2013). Ultimately, the jury did not believe Scates's version of the events. Scates is now asking this court to weigh the credibility of Bates's testimony against his own.  This is something we will not do. *See Little v. State*, 233 So. 3d 288, 292 (¶20)

(Miss. 2017) ("Nor do we reweigh the evidence or make witness-credibility determinations. Instead, when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." (quoting *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980))). Whether Bates's testimony was to be believed was within the sole province of the jury. Therefore, this Court will not substitute its judgment for that of the fact finder as to Scate's credibility just because Scates believes he was the more credible witness. *See Sullivan v. State*, 749 So. 2d 983, 986 (Miss. 1999). This issue is without merit.

## CONCLUSION

¶49. The trial court did not abuse its discretion by not granting Scates's motion for a mistrial on the ground of improper witness statements. Further, the trial court did not abuse its discretion when it denied Scates's motion for a new trial on the ground of juror intimidation. Further, the trial court did not abuse its discretion by denying Scates's motion for a new trial on the ground that jury's verdict was against the overwhelming weight of the evidence. Therefore, we affirm the judgment of conviction and sentencing.

¶50. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, McCARTY AND SMITH, JJ., CONCUR. BARNES, C.J., WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**